# EXHIBIT A

```
1                       IN THE UNITED STATES DISTRICT COURT

2                       IN AND FOR THE DISTRICT OF DELAWARE

3                                   - - -

   INTELLECTUAL VENTURES I, LLC,
4                                          :   CIVIL ACTION
                    Plaintiff,             :
5                                          :
              v.                           :
6                                          :
   CHECK POINT SOFTWARE TECHNOLOGIES LTD., :
7  CHECK POINT SOFTWARE TECHNOLOGIES INC., :
   McAFEE, INC., SYMANTEC CORP., TREND     :
8  MICRO INCORPORATED, and TREND MICRO,    :
   INC. (USA),                             :   NO. 10-1067-LPS
9                   Defendants.            :
                                   - - -
10
                           Wilmington, Delaware
11                       Thursday, November 3, 2011
                            TELEPHONE CONFERENCE
12
                                   - - -
13
   BEFORE:         HONORABLE LEONARD P. STARK, U.S.D.C.J.
14
                                   - - -
15  APPEARANCES:

16          FARNAN, LLP
            BY:  BRIAN E. FARNAN, ESQ.
17
               and
18
            SUSMAN GODFREY L.L.P.
19          BY:  BROOKE A.M. TAYLOR, ESQ.
               (Seattle, Washington)
20
               and
21
            SUSMAN GODFREY L.L.P.
22          BY:  JOHN P. LAHAD, ESQ.
               (Houston, Texas)
23
                      Counsel for Plaintiff
24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

2

```
 1    APPEARANCES:   (Continued)

 2

 3                  FISH & RICHARDSON, P.C.
                    BY:  WILLIAM J. MARSDEN, JR., ESQ.

 4                       and

 5                  FISH & RICHARDSON, P.C.
                    BY:  DAVID HEALY, ESQ., and
 6                       BENJAMIN C. ELACQUA, ESQ.
                         (Houston, Texas)
 7
                            Counsel for McAfee, Inc.
 8
                    MORRIS NICHOLS ARSHT & TAYLOR, LLP
 9                  BY:  KAREN JACOBS LOUDEN, ESQ.

10                       and

11                  McDERMOTT WILL & EMERY, LLP
                    BY:  DAVID M. BECKWITH, ESQ.
12                       (San Diego, California)

13                          Counsel for Trend Micro Incorporated
                            and Trend Micro, Inc. (USA)
14
                    MORRIS NICHOLS ARSHT & TAYLOR, LLP
15                  BY:  THOMAS C. GRIMM, ESQ.

16                       and

17                  DURIE TANGRI, LLP
                    BY:  CLEMENT S. ROBERTS, ESQ.
18                       (San Francisco, California)

19                          Counsel for Check Point Software
                            Technologies Ltd. and Check Point
20                          Software Technologies Inc.

21                  MORRIS NICHOLS ARSHT & TAYLOR, LLP
                    BY:  THOMAS C. GRIMM, ESQ.
22
                         and
23
                    LATHAM & WATKINS, LLP
24                  BY:  YURY KAPGAN, ESQ.
                         (Los Angeles, California)
25
                            Counsel for Symantec Corp.
```

3

```
 1                            - oOo -

 2                     P R O C E E D I N G S

 3              (REPORTER'S NOTE:  Telephone conference was held

 4     in chambers, beginning at 11:33 a.m.)

 5              THE COURT:  Good morning, everybody.  This is

 6     Judge Stark.  Who is there, please?

 7              MR. FARNAN:  Good morning, your Honor.  Brian

 8     Farnan on behalf of the plaintiff; and with me is Brooke

 9     Taylor and John Lahad from Susman Godfrey.

10              THE COURT:  Okay.

11              MR. GRIMM:  Good morning, your Honor, Tom Grimm

12     at Morris Nichols here in Wilmington.  I'm here on behalf of

13     both Symantec and Check Point this morning.  On the phone

14     with me for Symantec is Yury Kapgan at Latham & Watkins and

15     on the line with me for Check Point is Clem Roberts of Durie

16     Tangri.

17              THE COURT:  Okay.

18              MR. MARSDEN:  David Healy and William Marsden

19     and Ben Elaqua for McAfee.

20              MS. JACOBS LOUDEN:  For Trend Micro, this is

21     Karen Jacobs Louden from Morris Nichols.  On the line with

22     me is David Beckwith of McDermott Will & Emery.

23              THE COURT:  Is there anybody else?

24              Okay.  I have a court reporter with me and for

25     the record, it is our case of Intellectual Ventures versus
```

4

1    Check Point Software Technologies Limited, et al, Civil

2    Action No. 10-1067-LPS.

3              Today's call is to discuss two discovery

4    disputes that have arisen between the parties.  They're both

5    raised by defendants.  Will defendants be represented by

6    just one speaker today or tell me what you intend to do,

7    please?

8              MR. KAPGAN:  Your Honor, it's Yury Kapgan for

9    Symantec.  As you mentioned, there are two issues.  The

10   first one, in-house counsel access under the protective

11   order, I will be covering that issue.  My colleague Clem

12   Roberts will be covering the issue related to the number of

13   patent claims.

14             THE COURT:  Then you can go ahead first, please,

15   Mr. Kapgan.

16             MR. KAPGAN:  Thank you.  Good morning, your

17   Honor.  I want to make two basic points on this first issue

18   related to in-house counsel access under the protective

19   order.

20             The first is that the defendants have in-house

21   counsel who want to actively participant in the litigation;

22   and to do so, they should have accessed to information

23   relevant to plaintiff's claims.

24             The licensing information that plaintiff wants

25   to keep from in-house counsel is directly relevant to

1    evaluating plaintiff's claims for damages and what plaintiff

2    has asserted is the value of the patents at issue.  Past

3    licenses of patents certainly are relevant to evaluating

4    what the case is worth and any damages analysis.

5              Plaintiff's proposal would keep all of this

6    information out of the hands of in-house counsel and limit

7    their ability to participate in the critical part of the

8    case.

9              We know that most of plaintiff's business

10   consists of licensing activities.  Our proposal here

11   granting counsel to in-house information is pro-settlement

12   and allows them to fairly evaluate what the case is worth,

13   and it's a policy that I think should be promoted.

14             On the flip side, plaintiff is seeking

15   defendants' sales and financial information which has been

16   information from defendants you could consider equivalent

17   that would be directly relevant to damages.

18             Defendants have agreed that plaintiff's in-house

19   counsel may have access to this information, and this, too,

20   is pro-settlement and, for that matter, defendants also

21   agree that their licensing information should be available

22   to plaintiff's in-house counsel.

23             Plaintiff claims in its letter that defendants

24   are just seeking this information to gain a competitive

25   advantage in licensing negotiations, but the truth is that

1    any advantage that defendants obtained for this information

2    is really a natural consequence of plaintiff deciding to

3    pursue this litigation here in this forum.  It's not a

4    competitive harm, per se, that exists outside the confines

5    of this lawsuit.

6              If defendants can obtain more information that

7    helps settle this case, certainly, that is good from a

8    policy standpoint, but the bottom line here is, your Honor,

9    that this information is relevant to evaluating plaintiff's

10   claims and in-house counsel should be part of that process.

11             So that's the first point I want to make.

12             The second point is that defendants' technical

13   information is not equivalent to plaintiff's licensing

14   information.  Plaintiff makes a point in its letter that

15   if defendants' in-house counsel get access to licensing

16   information, then plaintiff's in-house counsel should have

17   access to defendants' technical information.

18             First of all, this is somewhat surprising to

19   us, your Honor, because in the last proposal that plaintiff

20   sent to us, there was no dispute we thought about the

21   status of technical information.  All the parties had

22   agreed it wouldn't be accessible by in-house counsel.

23             In any event, the comparison between licensing

24   and technical information is really an apples-to-oranges

25   comparison.  The reason that defendants' technical information

7

1    shouldn't be accessed by plaintiff's in-house counsel; and,

2    again, this is a point that didn't appear to be in dispute

3    in plaintiff's letter; is because there are serious concerns

4    that such disclosure would only lead to more litigation.

5              Plaintiff is in the business of acquiring

6    patents and licensing or litigating them.  If it had

7    technical information about defendants' products, it could

8    go out and be very directed in its purchases of additional

9    patents for litigation purposes, and it could try to amend

10   existing patent applications to try to cover some technical

11   aspects of defendants' products.  So there is a real concern

12   here about competitive harm from defendants' standpoint

13   outside the confines of this lawsuit that would result from

14   disclosure of defendants' technical information.

15             On the other hand, defendants aren't competitors

16   with plaintiff in the area of licensing.

17             To step back a bit here a bit on the history.

18             When we were negotiating the protective order,

19   plaintiff raised the possibility that the parties were

20   potential competitors in the area of patent acquisition.

21   For example, plaintiff suggested they may compete to buy the

22   same patents that are available for sale in the market and

23   if defendants knew about plaintiff's acquisition strategies,

24   plaintiff would be at a competitive disadvantage.

25             Although defendants believe they truly weren't

8

1    competitors in this area, they accommodated plaintiff's

2    concern in that regard by permitting information related to

3    patent acquisition strategies specifically to be shielded

4    from in-house counsel; and that is reflected in Exhibit A to

5    our letter.

6              But defendants here are not competitors with

7    plaintiff in the area of licensing, and we haven't heard any

8    explanation otherwise from plaintiff, so it's difficult to

9    understand the competitive harm that would result from

10   in-house counsel accessing this information.

11             The only other harm that plaintiff articulates

12   here is that knowledge about which patents are contained in

13   plaintiff's portfolio would influence defendants' business

14   plans by encouraging them to design around those patents,

15   but, of course, that point only actually supports disclosure

16   of the information.

17             Promoting avoidance of infringement, your Honor,

18   through design-arounds is a public policy that should be

19   fostered, and it's a principle that has been recognized by

20   the Federal Circuit in fact.  Public disclosure is the benefit

21   of the bargain for awarding exclusive rights under patent law,

22   and keeping patent information secret is contrary to public

23   policy.

24             Your Honor, those are the points I wanted to

25   make with respect to the first issue.

9

```
1              THE COURT:  Okay.

2              MR. KAPGAN:  We can move on to the second issue,

3    if your Honor still pleases, and Clem Roberts would address

4    that.

5              THE COURT:  Hold on, Mr. Kapgan.  You started

6    off saying licensing information is "directly relevant to

7    damages," and I think you said "and also the value of the

8    patents."  I want to try and understand, are you saying

9    there is two different things that the licensing information

10   is relevant to or is it just one thing?

11             MR. KAPGAN:  Your Honor, I think in any damages

12   analysis, when experts are opining on damages, I think that

13   in any damages analysis, the value of the patents, all of

14   that is relevant to, all of that would be gleaned from

15   licensing information.

16             THE COURT:  But it is ultimately relevant to

17   determining an appropriate damages analysis; correct?

18             MR. KAPGAN:  Correct.

19             THE COURT:  All right.  I want to deal with this

20   licensing issue before I move on to the other one, so let me

21   hear from the plaintiff on this.

22             MS. TAYLOR:  Yes, your Honor.  This is Brooke

23   Taylor.

24             The defendants want to protect their own

25   technical information, attorneys' eyes only, and are arguing
```

1    it should not be shared with in-house lawyers.

2              The stated need for this is that IV's in-house

3    lawyers don't see the technical information and use it to

4    purchase patents that read on defendants' offering.

5              THE COURT:  Ms.  Taylor, let me interrupt you.

6    I'm sorry.  We're having a hard time hearing you.  I need to

7    ask everybody other than Ms. Taylor to mute their phone

8    right now.

9              Go ahead, Ms. Taylor.

10             MS. TAYLOR:  The defendants, your Honor, want to

11   protect their own technical information as attorney's eyes

12   only, which will not be shared with IV's in-house lawyers.

13   The stated need for this is so that IV's in-house lawyers

14   don't see the technical information and use it to purchase

15   patents that read on defendants' offering.

16             But defendants refused to agree to equal

17   protection for IV's licensing agreements and strategic

18   information of the company, and what is sauce for the

19   goose should be sauce for the gander, and IV should have

20   reciprocal protection for the most sensitive protection.  And,

21             Just to be clear, and I will get to this again

22   in a second, but IV has offered to provide defendants'

23   in-house counsel with access to licenses that are specific

24   to the patents in suit, the specifics to the patents asserted

25   in this litigation.  What we're talking about here today is

 1    defendants want access to their in-house lawyers or IV's

 2    portfolio licenses which comprise hundreds of thousands of

 3    patents.  Defendants, not the plaintiff, bears the burden of

 4    showing why their need for this access trumps the risk of

 5    injury to disclosing party.

 6              When defendants asked us for access for their

 7    in-house counsel for this information, they admitted, as

 8    they have on this call today, that the reason they want the

 9    information is not for the purpose of litigating this case

10    but instead in order so they will be in a better negotiating

11    position, to negotiate with Intellectual Ventures over

12    thousands of patents that are not being litigated in this

13    case.

14              Through this protective order motion, defendants

15    are attempting to get access to the complete list of patents

16    owned and licensed by IV as a portfolio and the terms of the

17    licenses.  And,

18              Just to comment on something that Mr. Kapgan

19    said.  Of course, all public patents that have been issued are

20    publicly available, so if defendants seek to design-around

21    any patents that have been issued, they're certainly able to

22    do that throughout by looking at the publicly available list

23    of patents that have been issued by the Patent and Trademark

24    Office.

25              Wanting this information for business reasons, as

1    defendants do, is understandable but it is not a sufficient

2    reason to provide in-house lawyers access under the protective

3    order.

4         Defendants argue that their in-house counsel

5    won't be able to meaningfully participate in the case if they

6    don't have access to the licensing and strategy information,

7    although I haven't heard that arguments have been made that

8    strongly here today.

9         The contention is wrong on its face.  The case

10   is about whether defendants infringe the plaintiff's patent.

11   That determination will be made by comparing defendants'

12   offerings to the publicly available patents.  There is no

13   IV highly sensitive information required to make that

14   judgment about this critical part of the case.  Indeed, it's

15   defendants' information that will be relevant here, and

16   defendants have asked IV to litigate this case without its

17   in-house lawyers seeing that information.

18        Second, defendants will try to carry their

19   burden that the patents are invalid, relying on publicly

20   available prior art.

21        Again, there is nothing here that implicates

22   IV's highly confidential information.  The only area where

23   IV's licenses could be of any importance is determining

24   damages if the defendants infringe IV's valid patents.

25        Again, to the extent there are licenses that are

13

1    limited to the patent in suit, we have offered that in-house

2    counsel may see those agreements.  Defendants want more than

3    that because they are fishing for reasons unrelated to the

4    merits of this case even though they refuse to permit equal

5    access to IV's in-house lawyers.

6            As represented on this call here today,

7    defendants clearly have sophisticated and competent lawyers

8    who can interpret any information that is subject to the

9    higher bar of the protective order, just as IV's lawyers

10   will need to do the same with respect to defendants'

11   technical information.

12           Defendants have not argued that their outside

13   counsel are incapable of performing this task.  The patent

14   marketplace is a competitive one and unless defendants here

15   never acquire a licensed patent, they will be able to use

16   IV's highly sensitive information about licensing strategies

17   and terms to their benefit in that marketplace while

18   barring IV's in-house counsel access to their own technical

19   information.

20           Defendants have not met their heavy burden and

21   their proposal that IV's information be relegated to the

22   lower level of protection should be rejected.

23           THE COURT:  All right.  Ms. Taylor, first off,

24   Mr. Kapgan indicates that they have agreed that you can

25   protect and limit to outside counsel documents reflecting

1     your patent acquisition strategy.  Do you recognize that is

2     not in dispute?

3           MS. TAYLOR:  Yes, I do, your Honor.

4           THE COURT:  Let me ask you this:  Your agreement

5     to produce licenses that include the patents in suit, are you

6     only offering -- it's not production, I'm sorry, allowing

7     in-house counsel to see.  Is your offer to allow in-house

8     counsel to see licenses if they contain any of the patents in

9     suit or does it only go so far as to licenses that are limited

10    just to the patents in suit?

11          MS. TAYLOR:  It's the latter, your Honor.  It is

12    limited to the patents in suit or those particular patent

13    families.  So there are issues -- there are licenses either

14    by prior owners of these patents or by the plaintiffs in

15    this case that are specific to the patents in suit and only

16    to those patents in suit or their patent families, and we

17    will allow in-house -- we are willing to compromise and

18    allow in-house counsel access to those.

19          The issue here is really the portfolio license

20    which we submit defendants are really looking for not to

21    litigate the case, which their outside counsel can do, but

22    really to discover all of the patents held by Intellectual

23    Ventures, and, more importantly, to negotiate the terms of a

24    portfolio-wide license, which is not at issue in the case,

25    but the issue in this case is a license to two of the four

1    patents in suit.

2             THE COURT:  There is a statement in defendants'

3    letter indicating that they believe that you had suggested

4    disputes over designations could be decided in the future on

5    a case-by-case basis as you produce documents.  I don't know

6    if I got that suggestion out of your letter, but defendants

7    seem to believe you have at some point suggested that.  Is

8    that a position that you do take?

9             MS. TAYLOR:  Yes.  We absolutely remain willing,

10   and the idea here would be that if we agree that our inform-

11   ation is subject to the higher bar, if defendant, as they say,

12   think they need some information to share with their in-house

13   counsel to discuss settlement of this case or negotiation of

14   something, the portfolio license with the plaintiff, then

15   we're certainly willing to entertain requests for those and

16   for that information.

17            What we believe is happening here is a request

18   to get access to information for purposes outside of this

19   case but to use litigation to do that.

20            THE COURT:  Now, I'm concerned that if I allow

21   you to do that, that this may create quite a lot of disputes.

22   I know you evidently have a lot of licenses.

23            One thing that I might do, if I go down that

24   road, is send you all to a special discovery master and

25   have you all bear the cost of those disputes.  If I were

16

1   contemplating that, would that change in any way your

2   client's position with respect to that suggestion?

3          MS. TAYLOR:  Let me make sure I understand.  So

4   you would permit the higher designation with the caveat that

5   we would entertain requests down the road from defendants,

6   if they think they need them; and if we have disputes over

7   those requests, you would send us to the discovery master?

8          THE COURT:  That's the question, yes.

9          MS. TAYLOR:  Yes, we're certainly willing to

10  proceed in any way your Honor thinks is appropriate.

11         We think if the information, just as technical

12  information, bears this higher level of scrutiny down the

13  road, we're willing to listen to any request the defendants

14  have for particular information that their outside lawyers

15  believe their in-house counterparts would like to have

16  access to.

17         THE COURT:  All right.  Thank you.

18         Mr. Kapgan, is there anything else you want to

19  add?

20         MR. KAPGAN:  Your Honor, I'll just note I do

21  think we're amenable to whatever suggestion your Honor makes

22  on this point.  But, we do think that this creates some

23  potential for a lot of disputes in the future because we

24  do think that most of this licensing information would be

25  designated in the higher category, and we think that all

17

1    of this information is potentially relevant to damages.

2                We would be surprised if there were any licenses

3    that were specific to just these patents in suit and clearly

4    under the *Georgia-Pacific* factors, licenses to technology

5    that is comparable to the patents in suit is fair game for

6    any damages analysis.  So that is why we're seeking more

7    than just licenses to the patents in suit, because all of

8    this information is relevant to damages.

9                THE COURT:  Okay.  Thank you.

10               Well, I am going to essentially impose upon you

11   my suggestion, but it's a step-by-step process, so let me be

12   clear.

13               The first step is that on the issue today, I

14   largely agree with the plaintiff on this one in a couple of

15   particulars.

16               One, I think that given the business that the

17   plaintiff is in, the licenses and particularly the portfolio

18   licenses and particularly the patent acquisition strategy

19   is competitive-type information that is, in some respects,

20   analogous to the type of technical information relating to

21   the products produced by defendants.  Therefore, I start out

22   thinking that there is some reasonable basis for plaintiff

23   wanting to have a highly confidential "outside counsel only"

24   designation on such material.

25               I appreciate that the defendants have already

1    agreed to that designation with respect to patent acquisition

2    related documents, and I understand that that is therefore

3    not in dispute today.  But as an initial matter with respect

4    to today's dispute, again, I think that the plaintiff is

5    right to argue that there is some degree of analogy between

6    their documents and the defendants' documents.

7              Second, I do agree with the plaintiff that this

8    case can, just like in many cases, be litigated in a fully

9    adequate way on both sides, even with the restrictions on

10   what in-house counsel can see.

11             Just as plaintiff is going to be able to

12   effectively litigate this case without in-house counsel

13   seeing the technical documents of the defendants, I believe

14   that defendants will be able to effectively litigate this

15   case without their in-house counsel having complete access

16   to the plaintiff's portfolio licenses.

17             So today's dispute, the protective order I sign

18   will reflect the plaintiff's proposal, not the defendants'

19   proposal.

20             Now, all of that said, I do believe that defense

21   outside counsel will be in a position, once they receive

22   production of these licenses, you will see which ones are

23   marked highly confidential outside counsel only, which ones

24   are permitted to be shared with in-house counsel.  And,

25             In that regard, you will be able to evaluate and

1    meet and confer in a concrete manner with the plaintiff as to

2    whether or not you can negotiate some changes in designations.

3                 If you cannot, then as an initial matter, you

4    will all come back to me, and I will take a look at a concrete

5    dispute at that time.

6                 If I find that it's not one dispute, it's 10,

7    20, 30, 100 disputes, and it seems like it's going to keep

8    coming up, then my inclination will be to refer you to a

9    special discovery master who can carefully give you the time

10   and attention to go through license agreement by license

11   agreement and determine what a proper designation is for

12   each of them.  But, strictly speaking, that is not in front

13   of me today and I'm just telling you what my inclination is

14   today if that is where we end up.

15                Before I move on to the other dispute, let me

16   see if I have been clear enough on this one or if you have

17   anything else we should talk about on licensing.

18                Mr. Kapgan.

19                MR. KAPGAN:  No, your Honor.  Thank you.

20   Nothing from me.

21                THE COURT:  And Ms. Taylor?

22                MS. TAYLOR:  Same here.  Thank you, your Honor.

23   That was clear.

24                THE COURT:  All right.  Let's move on to the

25   next issue which I believe Mr. Roberts was going to address

Case 1:10-cv-01067-LPS   Document 162   Filed 11/23/11   Page 20 of 33 PageID #: 1269

20

1    first.

2              MR. ROBERTS:  Yes, indeed, your Honor.  Good

3    morning, your Honor.  Clem Roberts from Durie Tangri for

4    Check Point but speaking here on behalf of all of the

5    defendants.

6              Your Honor, it appears from the papers submitted

7    from both sides that there is now agreement that there ought

8    to be at least a date certain for the plaintiff to reduce

9    the number of claims in suit by at least some number.

10             Let's start with the timing.  The plaintiff

11   letter suggests that they are now willing, for the first

12   time, to commit to a date, and that date is six months from

13   now in April.

14             Your Honor, the defendants have spoken about

15   this, and we are prepared to accept that date.  I think I

16   speak for all of us when I say we think it ought to be

17   done sooner, but in terms of trying to narrow the issues in

18   dispute, we're prepared to accept that part of their offer.

19             The place where we get cross-wise with them,

20   your Honor, is on the number of claims.  They're proposing

21   12 claims per patent or 48 claims overall across the four

22   patents.  In this case, your Honor, we feel that is too many

23   claims and it's going to create an enormous burden on both

24   the Court and the defendants.

25             I won't repeat what is in our papers, but let me

1    just make a couple of quick points.

2                    First, there are a very large number of accused

3    products in this case.  As to Check Point alone, for

4    example, there are 14 families of accused products, many

5    of which have eight or ten actual products in then.  These

6    aren't just different sized boxes.  They're entirely

7    different code bases.

8                    Indeed, your Honor, for Check Point, we don't

9    make any anti-spam or any antivirus software themselves but

10   we OEM it in from a half dozen other companies.  So when you

11   are talking about our 14 different product families, you

12   are talking about literally different products developed by

13   different companies independent of each other.  There is

14   just a very large degree of complexity on the accused

15   product side.

16                   In light of that, having 48 claims creates an

17   enormous burden on the defendants.  If you start to think

18   about it, if I have got 48 claims and I have 14 accused

19   product families, how do I write a summary judgment motion?

20                   If I have a 40 page limit to my summary judgment

21   motion, how do I agree 14 different products against 48

22   claims sufficient to show the Court that there aren't factual

23   disputes?  I get one sentence or two sentences per product

24   per claim?

25                   It's one of these things where just the

1   complexity of trying to address that many different claims

2   against that many different products, you know, you just do

3   the math.  It's 578 different claims versus products for

4   Check Point alone before we start adding in all the other

5   products accused from the other defendants.  So in this case

6   where you have so many accused products, the complexity

7   caused by having nearly 50 claims would be enormous.

8           Second, that complexity will affect not just

9   the parties but also the Court on claim construction.

10          IV argued in its letter that the number of

11  asserted claims does not dictate the number of claim terms

12  in dispute because "claims within a patent use common terms

13  and common language."

14          As a factual matter, your Honor, in this case

15  that is not true.  Let's just take the '050 patent, for

16  example.  IV has asserted 14 claims of that patent of which

17  four are independent and 10 are dependent.

18          But if you start looking through the claims,

19  every single one of the claims beyond claim 1 is going to

20  add a new unique term for claim construction and sometimes

21  multiple.

22          So, for example, claim 2 add the term "hatching

23  algorithm," claim 4 adds "digital ID," claim 5 adds both

24  "public networks and private networks."  Claim 6 has

25  "intermediate server."  We can go through this for each of

23

1        the claims for each of the patents.

2               Especially when you are dealing with four

3        defendants, with dozens of different products, each of these

4        claim terms is going to be relevant to a noninfringement or

5        an invalidity argument for at least one of the defendants.

6        So it leads you into a situation where the Court is going

7        to be facing with 48 claims, 50-60 genuine disputes between

8        the parties as to what the meaning of the claims should be,

9        or the Court is going to be artificially imposing on the

10       parties a limit in the number of claim terms they can brief

11       and argue.

12              Now, that limit, let's say, for example, the

13       Court said I'm only going to hear a dozen different claim

14       terms.  That would resound enormously to the benefit of

15       the plaintiff.  Because, again, claim construction is an

16       exercise, frankly, that largely benefits the defendant in a

17       patent case because it adds clarity about what the scope of

18       the claims are; and, in general, the plaintiff wants to keep

19       the scope of the claims as flexible as possible for as long

20       as possible ideally in front of the jury so they can make

21       whatever argument they can make as defenses come up and so

22       that they can sort of adapt to claims and bend them as they

23       see the circumstances arise.

24              So either we're going to be in a situation with

25       that many claims where the Court can have a huge number of

1    disputes between the parties or it's going to be artificially

2    limiting the disputes here that it's going to hear to keep the

3    burden on the Court to a reasonable amount which is going to

4    result in enormous prejudice to the defendants.

5          So that's second point.

6          The third point I'll make, your Honor, is just

7    that if we're talking about April as a date, the plaintiff

8    will have had all of our documents by then for two months.

9    Document production will have been complete and will have

10   had our invalidity contentions for six months.

11         The idea that even at that point they're going

12   to know so little about their own case that they have to

13   keep literally four dozen claims at issue because they don't

14   know what they might want to assert at trial I think says a

15   lot about how they're approaching the case.

16         They sued four companies on 60 plus claims and

17   dozens of accused product families.  They have the right to

18   bring that case but they ought to be required to put the

19   work in to sort of bring that case to shore and to narrow

20   the claim to a reasonable number in a timely way.

21         If they will reduce it to sort of five claims

22   per patent, for example, your Honor, by April, there would

23   still be, you know, a dozen or 20 claims at issue against

24   dozens of asserted products even as to Check Point, and that

25   is plenty, plenty, plenty of complexity and may require a

1    huge undertaking from both of the defendants and the Court,

2    doubling and tripling that in terms of the base-side is

3    going to increase that workload substantially.

4              THE COURT:  All right.  A couple questions,

5    Mr. Roberts.

6              First, both parties have talked in terms of

7    limiting the number of asserted claims per patent.  If I

8    were to set an overall number of asserted claims, is it

9    important to also keep a per patent limitation?

10             MR. ROBERTS:  I don't think so, your Honor.  I

11   think the workload and the burden generally for the parties

12   is a function of the total number of claims, so we would

13   be willing to let the plaintiffs choose from among which

14   patents they want the claims in.

15             THE COURT:  To the extent I'm thinking of

16   entertaining what you have characterized perhaps fairly as

17   an artificial limit on the number of claim terms that I

18   would be willing to construe, if I were to adopt your

19   proposal of, let's say, 20 asserted claims by April of 2012,

20   where does that leave you in terms of your feeling about

21   any prejudice from an artificial limit of the number of

22   terms to be construed?

23             MR. ROBERTS:  Well, your Honor, obviously

24   depending what that number is.  If your Honor said to us

25   I'm going to construe two terms, then having 20 claims at

1   issue and the ability to construe two terms would be very

2   difficult.  So I think, your Honor, if you are going to set

3   reasonable limits on both the number of terms you are going

4   to hear and the number of claims that the plaintiff can

5   bring, I think obviously the defendants are going to be fine

6   with that.

7            THE COURT:  Let me hear from the plaintiffs,

8   please.

9            MS. TAYLOR:  Thank you, your Honor.

10            I think the use of the word "artificial" is

11   appropriate here.  This proposal by the defendants is an

12   artificial attempt to limit our constitutional patent right

13   by limiting the number of claims before even a piece of

14   paper has been produced when we have invalidity charts with

15   pages upon pages of references just listed, not yet charted

16   and not yet a deposition taken.

17            Mr. Roberts mentioned summary judgment.  Summary

18   judgment, as we all know, is not scheduled until the year

19   2013.  His proposal is unreasonable and premature.

20            As I mentioned, defendants initially failed to

21   chart any invalidity references, forcing the plaintiff to

22   either go to the Court with a discovery dispute early in the

23   case or wait an additional 30 days, which we did, to get a

24   set of invalidity charts in return.

25            Now, having those charts less than 30 days which

1    still merely lists a number of references without charting

2    them at all, defendants ask plaintiff to elect claims to an

3    unreasonable small number before we had sufficient discovery.

4    Defendants argue they want us to elect the small number of

5    claims when the claim construction hearing is set for next

6    August.

7                   Reducing the number of claims at issue, contrary

8    to what Mr. Roberts indicated, doesn't necessarily correlate

9    to the number of claim terms in dispute and merely listing

10   off phrases from a particular patent doesn't show that it

11   does.

12                  I suggest, your Honor, what we do is proceed

13   in the case, get some discovery underway, produce some

14   documents, take some depositions and see where we are next

15   spring.

16                  We haven't indicated a willingness to address

17   this issue, but at a more appropriate time next year, after

18   discovery has progressed, we would ask that you address the

19   issue at that time, if it is necessary.  Restricting to five

20   claims per patent or 20 overall really is something that

21   unprecedented.  I've been in a lot of patent litigations and

22   have never seen that even defendants ask for but certainly

23   not receive a limit to that few number of products.

24                  What we ultimately will be trying in this case

25   and how the Court manages its docket and the parties manages

 1    its docket will be determined later.  Mr. Roberts and the

 2    other defendant counsel will have to produce the documents

 3    regardless, you know, the number of claims that are at

 4    issue in this case.  I suggest we should consider this issue

 5    amongst ourselves down the road next spring and then we

 6    will, if we need to, which I hope we don't, we can come back

 7    to you at that time.

 8             THE COURT:  I think you unintentionally misspoke.

 9    You suggested maybe they're trying to limit you to the number

10    of products you have accused.

11             MS. TAYLOR:  I'm sorry, your Honor.  I meant

12    the number of claims as, you know, whether it's on a per

13    patent basis or, in response to your question, the sheer

14    number of claims.

15             I don't think the number of claims that is in

16    this case now is an unreasonable number, certainly not when

17    we haven't had any document discovery done or deposition

18    discovery done.

19             THE COURT:  Right.  But they're not asking you

20    at this point to reduce your number of claims asserted at

21    all.  They want to give you six months before you have to do

22    it.  And, I had understood from your letter that that was a

23    process that you were willing to engage in.

24             Whether or not you are willing to engage in it,

25    to the extent I'm considering requiring you to do it, what

1   would be the unfair prejudice of six months from now having

2   to reduce the number of asserted claims?

3            MS. TAYLOR:  You read our responsive letter.

4   Preferably, in the event the Court thinks it's appropriate

5   to consider this issue now, we did offer to go to 12 claims

6   per patent by April 7th, which is a date two months after

7   the document production is supposed to be substantially

8   complete.

9            Assuming that defendants meet that deadline,

10  then we're willing to go ahead and elect 12 claims per

11  patent by April 7th.  But the idea that it would go down to

12  some number drastically lower than that I don't think will

13  save the parties or the Court work in any way, and I think

14  it's premature to address that at this point, to go to some

15  number as low as five per patent.

16           THE COURT:  You also argued that to do so would

17  be unprecedented, but I believe there was a recent Federal

18  Circuit decision, *stamp.com*, that I think, as I understood

19  it, affirmed a District Court order with a limit of I think

20  a total of maybe 15 claims being asserted across multiple

21  patents.

22           Are you familiar with that or can you help me

23  understand your contention that it would be unprecedented

24  for the Court to do something consistent with what the

25  defendants are asking?

```
 1              MS. TAYLOR:  Your Honor, I'm not familiar with

 2   that particular decision.  I apologize.  But I don't know at

 3   what point the Court required that.  There are courts that

 4   are presiding over patent litigation to ask the parties

 5   to elect the claims.  I know in certain Districts, the

 6   claims that are not elected are preserved to be tried at a

 7   later date.

 8              I don't know if that is what we're talking about

 9   here.  We haven't had that discussion with the defendants.

10   But I also think, I don't know what the timing was in that

11   decision.  Most jurisdictions I'm aware of claim election,

12   they happen at a date many times after the Markman or just

13   before the Markman proceeding.

14              THE COURT:  Okay.  Is there anything else,

15   Ms. Taylor?

16              MS. TAYLOR:  Nothing from me, your Honor.

17              THE COURT:  Okay.  Mr. Roberts.

18              MR. ROBERTS:  No, your Honor.  I think your

19   Honor has the point exactly.

20              THE COURT:  If you would, address that question

21   about if I am to restrict them, what happens to the other

22   claims?  Are they preserved to be tried in another date or

23   are you asking me to say they're done with them forever?

24              MR. ROBERTS:  So, your Honor, I haven't looked

25   at that issue in detail.  I assume that the Federal Circuit
```

1    has addressed that.  Certainly, whatever the Federal

2    Circuit has suggested is appropriate, we're amenable to.

3              THE COURT:  Here is my ruling.

4              On this one, I largely agree with the defendants

5    position.  Therefore, I am going to require the plaintiff

6    to reduce the number of asserted claims in this case by

7    April 7th of 2012, to reduce the number of asserted claims

8    to no more than a total of 20, which can be allocated among

9    the four patents in suit however plaintiff wishes.  And,

10             Further, I'm going to impose at this point a limit

11   in advance of the Markman hearing in that in connection with

12   the Markman process, leading to the hearing, the Court will

13   construe no more than a total of 20 disputed claim terms.

14             The Court understands that there may be more

15   than 20 disputed claim terms among the parties, and, if so,

16   the Court understands that it has an obligation to resolve

17   the remaining disputes by the time the case is submitted to

18   the jury.  But in connection with the Markman hearing and

19   the Markman process, again, the Court is going to limit its

20   consideration and its resolution to a total of 20 disputed

21   claim terms.

22             In the Court's view, these rulings adequately and

23   effectively and reasonably balance the competing interests

24   among the parties as well as the Court's interest, indeed,

25   need for judicial economy, and these rulings are intended to

1    and, the Court believes, do accomplish all of that.

2              On this issue that was just raised at the last

3    moment about what happens to the other claims in the patents

4    in suit beyond the 20 that the case will be limited to in

5    April, I'm not making any ruling on that.  The issue has not

6    been briefed and I don't mean by today's ruling to make any

7    determination on that issue.

8              I don't want more argument on these issues but

9    are there any questions about what I have ruled, Mr. Roberts?

10             MR. ROBERTS:  No, your Honor.  Thank you.  The

11   only question is would your Honor like supplemental briefing

12   at some point on what the effects on the other claims ought

13   to be, and, if so, when?

14             THE COURT:  I'm not asking for anything at this

15   point.  I'm going to hope that when you all go back and

16   consult Federal Circuit law that you all come to the same

17   conclusion on what the answer is.  If you do have a dispute

18   on it, then one or both of you should send me a letter and

19   tell me you have that dispute, if you think it is something

20   I need to address, and do it at the time you think I need to

21   address it.

22             Is there anything else, Mr. Roberts?

23             MR. ROBERTS:  No, your Honor.  Thank you.  That

24   sounds reasonable.

25             THE COURT:  And Ms. Taylor?

1               MS. TAYLOR:   Thank you, your Honor.

2               THE COURT:   Okay.   Thank you all very much.

3     Good-bye.

4               (Telephone conference ends at 12:13 p.m.)

5

6          I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.

7

8                              /s Brian P. Gaffigan
                               Official Court Reporter
9                              U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25