1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

    GREATBATCH LTD.,
4                                        :      CIVIL ACTION
              Plaintiff,                 :
5                                        :
              v.                         :
6                                        :
    AVX CORPORATION, and                 :
7   AVX FILTER CORPORATION,              :
                                         :      NO. 13-723-LPS
8             Defendants.
                               - - -
9
                        Wilmington, Delaware
10                   Tuesday, December 22, 2015
                        *Pretrial Conference*
11
                               - - -
12
    BEFORE:        HONORABLE **LEONARD P. STARK**, Chief Judge
13
    APPEARANCES:                   - - -
14

15              FARNAN, LLP
                BY:  BRIAN E. FARNAN, ESQ.
16
                     and
17
                HARRIS BEACH, PLLC
18              BY:  JAMES R. MULDOON, ESQ.
                     (Syracuse, New York)
19
                     and
20
                HARRIS BEACH, PLLC
21              BY:  NEAL F. SLIFKIN, ESQ., and
                     LAURA W. SMALLEY, ESQ.
22                   (Pittsford, New York)

23                   Counsel for Greatbatch Ltd.

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter

```
 1    APPEARANCES:   (Continued)

 2
                       RICHARDS LAYTON & FINGER, P.A.
 3                     BY:   ROBERT W. WHETZEL, ESQ.,
                             CHAD MICHAEL SHANDLER, ESQ.,
 4                           TODD ANTHONY COOMES, ESQ., and
                             JASON JAMES RAWNSLEY, ESQ.
 5
                             and
 6
                       NUTTER McCLENNEN & FISH, LLP
 7                     BY:   RONALD E. CAHILL, ESQ.
                             (Boston, Massachusetts)
 8
                                   Counsel for AVX Corporation
 9                                 and AVX Filter Corporation

10

11

12

13

14

15                                 - oOo -

16                           P R O C E E D I N G S

17               (REPORTER'S NOTE:   The following pretrial

18    conference was held in open court, beginning at 11:05 a.m.)

19               THE COURT:   Good morning, everyone.

20               (The attorneys respond, "Good morning, Your

21    Honor.")

22               THE COURT:   I'll have you put your appearances

23    on the record for me, please.

24               MR. FARNAN:   Good morning, Your Honor.

25               THE COURT:   Good morning.
```

1          MR. FARNAN:  Brian Farnan upon behalf of the

2    plaintiff.  With me is Jim Muldoon, Neal Slifkin and Laura

3    Smalley, all from Harris Beach, and Michael Sleeve

4    (phonetic) from Greatbatch.

5          THE COURT:  Welcome to all of you.

6          MR. MULDOON:  Thank you, Your Honor.

7          MR. WHETZEL:  Good morning, Your Honor.  Bob

8    Whetzel from Richards Layton for the defendants.  With me is

9    Ron Cahill, Jason Rawnsley, Chad Shandler, Todd Coomes, and

10   our technologist, Daniel White.

11         THE COURT:  Welcome to all of you as well.  Have

12   a seat.

13         So we are here for the pretrial conference for

14   the jury trial scheduled to begin on January 11th.  We've

15   got quite a lot to cover in our time together today.  Let me

16   tell you the order in which I plan to go through things.

17         I first want to hear argument on AVX's motion

18   for reargument or clarification with respect to the '627

19   patent, and the related request for supplemental claim

20   construction of Greatbatch and essentially talk about

21   whether or not the '627 patent infringement is an issue for

22   the jury or not.  So we'll start with the discussion of all

23   of those issues which I view as related.

24         After that, we'll hear brief argument if the

25   parties wish to be hard on Greatbatch's motion for sanctions

1   which is still outstanding.

2           Then we'll move on to the motions in limine, and

3   I'll rule on most of them without argument, but I believe I

4   will need argument on at least one of them.

5           Then we'll discuss numerous other issues that

6   the parties raised in the pretrial order.  We'll talk about

7   the mechanics of the trial.

8           And I'll give you an opportunity after all of

9   that to raise any other issues that you may have that we

10   haven't otherwise gotten to.

11           But before I dive into all of that, I will give

12   you a chance now to ask me, if you have any questions, or if

13   there is anything you want me to know before we dive into

14   the agenda I have laid out.  So first from the plaintiffs.

15           MR. MULDOON:  No, Your Honor.

16           THE COURT:  Okay.  And from the defendants?

17           MR. WHETZEL:  No, Your Honor.  We're prepared to

18   proceed.

19           THE COURT:  Okay.  Then let's start with the

20   whole issue of clarification and claim construction related

21   to the '627 patent.  I'll hear from the defendants first.

22           MR. WHETZEL:  Yes, Your Honor.  And, first, as

23   to the clarification request, as the Court is aware, Your

24   Honor construed the "asymmetry" and related term "symmetry"

25   in the claim construction order that was issued a few weeks

1    ago.  We ask the Court construe the term "non-ground lead

2    passageways" as the Court used the order in light of an

3    apparent dispute as to what that term means.

4         We ask the Court simply to construe that term

5    or to define that term in the language of the claims

6    specifically to mean "passageways for terminal pins" or in

7    the specific language of claim 11 "first passageways."

8         Greatbatch, by contrast, is proposing that claim

9    be defined very broadly.  We think indefinitely, and by

10   reference to structures that are not claimed in, described

11   in or really even part of the '627 claims or invention.

12        So the Court determined that "symmetrical" is

13   to be defined with reference to ground lead passageway and

14   non-ground lead passageways.  In so doing, the Court

15   construed and looked at the intrinsic evidence in a

16   particular specification and embodiments that illustrate the

17   symmetrical and asymmetrical devices.

18        The term of interest here is "feedthrough filter

19   capacitor."  In the patent that is consistently defined as

20   including first and second sets of plates, a first

21   passageway, and a second passageway.

22        From that, Your Honor, we conclude that the

23   asymmetrical or symmetrical relationship has to be between

24   those elements.  There is nothing else claimed.  There is

25   nothing else disclosed.  There is nothing else even hinted at.

1          THE COURT:  If I ask it in this way, what is

2     your response?  Is the symmetry to be measured with respect

3     to the feedthrough filter capacitor as a whole?

4          MR. WHETZEL:  I think it is to be defined with

5     respect to the feedthrough filter capacitor as it is

6     described and claimed in the patent.

7          THE COURT:  And is that as a whole?

8          MR. WHETZEL:  As a whole, Your Honor, it's

9     described and claimed in the patent with reference to plates

10    and passageways.

11         THE COURT:  Is there a factual dispute as to

12    what the feedthrough filter capacitor is as a whole?

13         MR. WHETZEL:  I don't believe so, Your Honor.  I

14    believe Greatbatch is in agreement that the structure of

15    the accused products is known.  Their expert analysis, which

16    we've put forward in our motion, illustrates very clearly

17    the first and second passageways.  They don't point to this

18    other hole in the feedthrough filter capacitor.  And I

19    think the claim and the specification make clear what the

20    patentee meant and what the patent covers in terms of what

21    the feedthrough filter capacitor is.  I think that is a

22    question of law and a question of fact.

23         THE COURT:  I have your motion in front of me,

24    and I want to talk to you about the figure you have at page

25    5.  So you may want to grab it.

1              MR. WHETZEL:  Yes, Your Honor.

2              THE COURT:  If I look at the top figure on page

3    5, it's pointing out first passageways.  Do you see what I'm

4    talking about?

5              MR. WHETZEL:  If Your Honor gives me one second?

6              THE COURT:  Sure.  Take your time.

7              (Pause.)

8              MR. WHETZEL:  I grabbed the wrong notebook.  I

9    apologize.

10             THE COURT:  I've got plenty of paper here myself.

11             MR. WHETZEL:  Yes, Your Honor.

12             THE COURT:  All right.  So towards the bottom

13   of that top figure, there is a solid line that goes around

14   and encompasses all of what you have labeled here as first

15   passageways as well as that hole to the left of the figure

16   that is not labeled.  Do you understand which line I'm

17   talking about?

18             MR. WHETZEL:  I do, Your Honor.  The dashed line.

19             THE COURT:  Not the dashed line.  I'm talking

20   about the solid line.

21             MR. WHETZEL:  Yes, Your Honor.

22             THE COURT:  But then I did want to refer you to

23   the dashed line which is interior to the solid line.  Do you

24   see what I'm talking about?

25             MR. WHETZEL:  I do, Your Honor.

1          THE COURT:  The dashed line does not include

2     within it the circle that is unlabeled to the left.  Do you

3     see that?

4          MR. WHETZEL:  Um-hmm.

5          THE COURT:  And that circle to the left as I

6     understand it, that is the hole for the RF antenna.  Correct?

7          MR. WHETZEL:  That's correct, Your Honor.

8          THE COURT:  All right.  So my question is, the

9     feedthrough filter capacitor has a hole, is it what is

10    encompassed by the solid line or is it what is encompassed

11    by the dashed line or is it something else?

12         MR. WHETZEL:  Your Honor, first I'd point the

13    Court to the claim in the specification and in particular

14    the element of claim 11 that talks about feedthrough filter

15    capacitor and the elements that are described there which

16    again would be plates, the first passageways and the second

17    passageways.

18         With specific reference to this figure, that

19    most certainly is not everything that is included within

20    the solid line.  The patent also makes reference to a common

21    base structure or to a common ceramic structure that can

22    contain multiple feedthrough filter capacitors and other

23    things.

24         So it's defendants' position that the structure

25    shown in the solid line is more than the feedthrough filter

1    capacitor.  And, of course, the Court has already construed

2    "feedthrough filter capacitor" to mean "a capacitor that is

3    designed for use in combination with electrical connectors

4    and filters high frequency electrical signals."

5            I don't think there is any dispute, and in

6    Greatbatch's expert analysis it is conceded that this hole

7    for the RF pin is not connected to electrode plates and is

8    not filtered.

9            THE COURT:  So I take from all of that that in

10   the defendants' view, the solid line area is more than the

11   whole feedthrough filter capacitor of the claim; correct?

12           MR. WHETZEL:  As claimed.  Yes, Your Honor.

13           THE COURT:  Now, is it further the defendants'

14   view that what is within the dashed lines is the hole of the

15   feedthrough filter capacitor?

16           MR. WHETZEL:  Your Honor, I will answer by

17   saying everything within the dashed line is part of the

18   feedthrough filter capacitor.  As claimed, the feedthrough

19   filter capacitor more specifically is the plates and the

20   passageways and the asymmetry relationship that we're

21   looking for is in specific the relationship between the

22   second passageway and the first passageways.

23           THE COURT:  All right.  You may go on.

24           MR. WHETZEL:  I think Your Honor has largely,

25   through the Court's questioning, addressed the other points

1    that I wanted to mention.

2            As we have submitted in our papers, we believe

3    this issue is dispositive of claim 11, at least under the

4    Court's claim construction.

5            We don't believe that Greatbatch's construction

6    could possibly be correct.  You can't apply non-ground

7    lead passageways to a structure or feature and element that

8    is not claimed and disclosed in or even discussed in the

9    patent.  That would render the claim invalid under various

10   Section 112 theories and that is not an appropriate

11   construction.

12           On that basis, we submit that the Court should

13   enter summary judgment of noninfringement for that.  These

14   issues were raised in the summary judgment papers that were

15   presented in court.  And under settled authority, the Court

16   has the authority to enter summary judgment in this case for

17   the nonmovant.

18           THE COURT:  So if I were, alternatively to your

19   approach, to adopt the plaintiff's approach and I guess

20   reconstrue or modify our construction, under that view,

21   would I grant judgment to them and take the issue away from

22   the jury or would there be a jury issue in your view?

23           MR. WHETZEL:  Your Honor, that is, the former is

24   the position we have taken in our papers.  If the Court is

25   inclined to apply a mirror-image-based claim construction to

1    the structures as shown and it is going to include this

2    hole for the RF pin, I can't fairly argue that the structure

3    would be symmetric under that application.

4              THE COURT:  So on the defendants' view, regardless

5    of which way I come out, the question of infringement of the

6    '627 shouldn't be placed before the jury.

7              MR. WHETZEL:  Yes, Your Honor.

8              THE COURT:  Now, I don't mean to fight with you

9    on that but let me make sure I understand.  Why is there not

10   alternatively a genuine dispute of fact as to whether the

11   hole of the feedthrough filter capacitor is the solid line

12   or the dashed line or perhaps something else?

13             MR. WHETZEL:  We view that as an issue of claim

14   scope and claim construction, Your Honor.  I think it is an

15   issue of law.  I think it goes to the scope of the claim,

16   what is the feedthrough filter capacitor, what is the

17   passageway and, most importantly for this purpose, what

18   features do we look to to find the asymmetry relationship.

19             THE COURT:  So assume I'm persuaded that it is a

20   question of law, the whole infringement question one way or

21   the other.  What impact does that have on the jury trial?

22   Do you want to go forward on your invalidity defenses with

23   respect to the '627 or does that depend on which way I come

24   out?

25             MR. WHETZEL:  Well, certainly, Your Honor, if

1    the Court finds claim 12 to be infringed, we need to proceed

2    on the invalidity defenses.  If the Court finds claim 12 to

3    be not infringed, for the most part the invalidity defenses

4    are raised as affirmative defenses and therefore would not

5    be presented at this time.

6              There is, as the Court may recall, a

7    counterclaim for invalidity and equitable conduct with

8    respect to the inventorship issue as an affirmative defense,

9    although there is a debate about that apparently as we heard

10   this morning, and also with respect to the inequitable

11   conduct issue which would only be for a bench trial.

12             I would think if the Court granted summary

13   judgment of noninfringement, with an appropriate stipulation

14   or if there is a dispute and order, that the remaining

15   inventorship and inequitable conduct issue could likely be

16   postured for presentation in a subsequent bench trial at

17   whatever point that may be scheduled.

18             THE COURT:  All right.  And if and you need to

19   confer on this, that is fine.  I don't mean to pin you down,

20   no puns intended.  In terms of the request for the number of

21   hours for this trial, if I'm ultimately persuaded that the

22   '627 infringement at least is not for the jury, does that

23   have any impact on your request for I think it was 30 hours?

24             MR. WHETZEL:  Your Honor, that depends on,

25   without trying to pin the Court down, which way the Court

1    goes on that issue.  If the invalidity issues remain for

2    trial to the jury, I don't think that materially affects

3    the length of the trial in this case.

4              If the infringement issue is decided in AVX

5    favor and the invalidity affirmative defenses do not proceed

6    to the jury trial, that would knock a substantial portion of

7    time off of the trial request but without consulting with my

8    co-counsel, I'd prefer not to be pinned down on a specific

9    number, but it would shorten the amount of time.

10             THE COURT:  Okay.  Thank you.  Is there anything

11   else before I hear from plaintiff?

12             MR. WHETZEL:  Not on this issue, Your Honor.

13             THE COURT:  All right.  Let me hear from

14   plaintiff then.

15             MR. SLIFKIN:  Thank you, Your Honor.

16             THE COURT:  Good morning.

17             MR. SLIFKIN:  First, I'd like to say we're at a

18   fairly substantial disadvantage here because they filed a

19   brief on the issue.  Our brief is not yet due, won't be due

20   until January 4th, I believe.  Although we have given some

21   of our arguments in the pretrial order, we haven't filed a

22   formal response to their motion for reconsideration.

23             THE COURT:  Well, what would you have me do then?

24             MR. SLIFKIN:  We would file our brief, according

25   to the Court's procedures, and they would file a reply.  I

1    assume they would do an expedited one and not take a full

2    amount of time for the reply.

3            THE COURT:  Have you asked to modify the

4    briefing schedule?

5            MR. SLIFKIN:  No, Your Honor.  We believe that

6    our brief is due January 4th, and we don't believe any

7    modification is necessary.  We would file it on January 4th.

8    And they would need the modification or they would just do

9    the reply in a day or two.

10           So we have not fully briefed this issue.  I am

11   prepared to talk about it, but I'd just like to state we are

12   at a disadvantage because they have submitted a full brief.

13           THE COURT:  It is one thing to say you are at a

14   disadvantage, it is another to say you think it would be

15   somehow a violation of your rights or truly unfair for me

16   to rule on an issue for a trial that is five weeks away.

17           MR. SLIFKIN:  I think, Your Honor, they filed

18   the full brief and we have not.  So, yes, we have not had

19   the opportunity to brief the issue.

20           I am prepared to respond to some of their

21   arguments, but I do think if the Court is inclined to rule

22   against us, we have been prejudiced by the fact that they

23   filed a motion under the Court's procedures and have not

24   allowed enough time for us to do our opposition papers

25   before this appearance at the court.

1            THE COURT:  All right.  Let's see how far we can

2    get.  Go ahead.

3            MR. SLIFKIN:  Sure.  So in addition to the issue

4    on the briefing schedule, we just think it's too late to be

5    raising this issue, Your Honor.  They could have moved when

6    they moved for summary judgment on the indefiniteness issue.

7    They could have at the same time said, in the alternative,

8    here is what we believe it means.  Here is the construction

9    we propose.

10            They didn't.  They made a strategic decision to

11    live or die by the motion on indefiniteness.  The Court

12    found the claim to be indefinite and offered a construction.

13            Now, after they don't like the construction,

14    they're making yet another motion and not a motion for a

15    construction but a motion to construe the construction.

16    They want you to define what certain words in your examples,

17    in your construction mean.

18            The construction itself is very simple.

19    "Asymmetry" means "not symmetrical."  Then there are examples.

20    And those examples we believe accurately reflect the meaning

21    and the understanding of the construction.  It's simple, it's

22    easy to understand, and it's correct.

23            What they want to do here, Your Honor, is

24    similar to their argument on the pad.  They want to split

25    the capacitor into parts.  They want to say, oh, but this

1    capacitor has certain parts.  And we want you, Your Honor,

2    to look at only certain parts of those, the capacitor.  I

3    would like to direct Your Honor's attention to the patent

4    itself.

5                    (Elmo settings adjusted.)

6                    MR. SLIFKIN:  At column 7, line, starting line

7    26 or so.  It refers to the feedthrough filter capacitor as

8    Item No. 40.

9                    If you go to the drawings, for example, Figure

10   5, you can see 40 is the block of ceramic that now they what

11   they want to say is, oh, wait a minute, capacitor is

12   something else.  It's not 40, it is something inside of 40

13   that is part of the capacitor.

14                   The patent is very clear and consistent that the

15   entire block of ceramic is the capacitor.  I don't think

16   there is any real dispute over that.  It's a monolithic

17   capacitor, just like it was a monolithic braze.

18                   THE COURT:  So looking at the figure I discussed

19   with Mr. Whetzel, how does what you just said translate to

20   that figure?

21                   MR. SLIFKIN:  Your Honor, I don't have that figure.

22                   THE COURT:  Mr. Whetzel, do you happen to have

23   an extra copy?  And if not ...

24                   MR. WHETZEL:  I'm certainly happy to share mine,

25   Your Honor.

1          THE COURT:  Thank you.  We're at page 5 of their

2     motion, and there is the topmost figure.  Do you see that?

3          MR. SLIFKIN:  Sure.  And that figure

4     corresponds, the black line in that figure on the outermost

5     perimeter corresponds exactly to what is shown in Figure 5

6     and other figures.

7          THE COURT:  Now, I can tell you have a color

8     copy.  Unfortunately, I brought a black-and-white copy.

9          How would you -- by black line, I was focused in

10     my questioning before on the bottom part of that top figure

11     which has a rectangular solid line which looks like it might

12     be black and then has a dashed line inside of it.  Are we

13     talking about the same thing?

14          MR. SLIFKIN:  We are, Your Honor.  The solid

15     line that is around the outer perimeter of the device is the

16     top view of what is shown right there.  There may be -- I

17     don't see other views in the patent itself, but if you --

18     that's a perspective view, Your Honor, right there, 5.  And

19     what they have is a top view.  But we're talking about the

20     same thing.  Item 40.

21          THE COURT:  So that solid rectangular line at

22     the bottom of the top figure that encompasses not just the

23     dashed line but also the RF antenna hole to the left, that

24     is in the plaintiff's view the entirety of the feedthrough

25     filter capacitor of the claims; correct?

1          MR. SLIFKIN:  Yes, Your Honor.  And that is

2     consistent with the patent that describes it as monolithic.

3          THE COURT:  Now, in the plaintiff's view, is

4     there an actual dispute on that point?

5          MR. SLIFKIN:  As to what is the capacitor?

6          THE COURT:  What the hole of the feedthrough

7     filter capacitor is.

8          MR. SLIFKIN:  In our view, it is very clear from

9     the patent itself that the capacitor is the solid block, the

10    monolithic block or, as the patent said, monolithic ceramic

11    capacitor.

12          That upper part in Figure 5 there, if I may

13    approach the screen?

14          THE COURT:  Sure.

15          MR. SLIFKIN:  This block on top here is the

16    capacitor.  It's ceramic.  It's monolithic.  It's Item No.

17    40 in the drawing and consistently in all the other figures

18    as well.

19          THE COURT:  So is there sufficient evidence

20    in the record from which a reasonable fact-finder could

21    disagree with you and find that, instead, the hole of the

22    feedthrough filter capacitor does not include the RF antenna

23    hole?

24          MR. SLIFKIN:  In our view, Your Honor, it's

25    very clear that the entire block is the capacitor.  If your

1    construction remains consistent, there is no question of

2    fact of infringement.  And I think Mr. Whetzel may have

3    conceded that in the Court's construction.  I think it was

4    something about he could not argue that the RF pin was part

5    of that.

6              Certainly, the RF pin is a non-ground lead

7    passageway.  In your construction, Your Honor, there are two

8    types of passageways, ground lead and non-ground lead.

9    There is no dispute that the RF pin -- at least I believe no

10   dispute that the RF pin passes through a non-ground lead

11   passageway.

12             So with that construction, and finding that the

13   capacitor is the solid block of ceramic noted by the patent

14   as Item 40, I don't believe there is a dispute of fact as to

15   infringement.

16             THE COURT:  So in your view, regardless of which

17   way I come out on this, the '627 infringement issue should

18   not be before the jury?

19             MR. SLIFKIN:  Well, Your Honor, certainly, if

20   you find in our favor on the construction, I believe that is

21   the case.

22             If you find that the construction -- I suppose

23   it might depend on how you end up construing your

24   construction is what they're asking for.  What do you mean

25   by -- they're asking what do you mean by non-ground lead

1    passageways?

2              So it may depend on what construction, new

3    construction you come up with.  I'd have to see it.

4              Yes, Your Honor.  There still might be a

5    question of fact as to if we're looking at the plates, and

6    that is the dashed line in the figure in AVX's brief, if

7    we're looking at the plates, the plates are asymmetrical as

8    well.

9              So the plate on the -- the dashed line on the

10   right-hand side is strictly vertical, if you can see what

11   I'm referring to.  On the left-hand side.  The dashed line

12   has a little jog on it.  So if you fold it, the capacitor,

13   in half, the two lines would not match up.  They would be

14   asymmetrical.

15             THE COURT:  You referenced the "non-ground"

16   language in the patent.  Isn't that exemplary or is that the

17   full scope of the patent?

18             MR. SLIFKIN:  Well, I'm not sure I understand

19   your question, Your Honor.

20             THE COURT:  Well, just a moment ago, when you

21   were talking about the non-ground passageway.  Is it your

22   understanding that the scope of the patent claims is

23   exhausted by that or is it just an example, an embodiment?

24             MR. SLIFKIN:  Well, there are two types of

25   passageways in describing the patent:  ground passageways

1    and non-ground passageways.

2              So with the construction Your Honor has found,

3    certainly the construction covers all passageways described

4    in the patent, non-ground and ground passageways.

5              THE COURT:  All right.

6              MR. SLIFKIN:  Unless you have any other

7    questions, that is all I have on the issue.

8              THE COURT:  Well, I guess just to try to

9    understand your position.  I take it you are not prepared to

10   say today, as I heard from Mr. Whetzel.  If I understand him

11   correctly, he views infringement of the '627 as not a jury

12   issue no matter what I do.  That is not plaintiff's position;

13   correct?

14             MR. SLIFKIN:  That is correct, Your Honor.

15   If you change the construction, we still believe that

16   potentially the ground plate issue or the electrode plate

17   issue renders the AVX device asymmetrical.  Again, it would

18   depend on how you construed the language, but there still

19   may be an issue of fact as to whether or not, under the new

20   construction, there is symmetry for the electrode plates.

21             THE COURT:  If we were to agree with you, though,

22   there is a way in which you suggested this becomes a question

23   of law and you get summary judgment on infringement; correct?

24             MR. SLIFKIN:  Yes, Your Honor.  If your

25   construction remains intact, I don't think there is any real

1   dispute that there are an unequal number of pins on one

2   side of their products from the other in the two products at

3   issue.

4          THE COURT:  And I recognize we're going to

5   multiple levels of contingency here, but do you have any

6   initial thoughts on what impact there might be on the trial

7   depending on whether we take the infringement of the '627

8   issue away from the jury?

9          MR. SLIFKIN:  Certainly, the trial would be

10   shorter.  We wouldn't need to take that issue to the jury.

11   So other than timing, I don't know that there is much of an

12   impact, Your Honor.

13          THE COURT:  Is there anything else?

14          MR. SLIFKIN:  No, Your Honor.

15          THE COURT:  All right.  Thank you.  Mr. Whetzel,

16   you can come on back.

17          MR. WHETZEL:  Very briefly, Your Honor.

18          I'd like to take the Court back to first the

19   language of claim 11 where the feedthrough filter capacitor

20   is described as having first and second sets of electrode

21   plates, the first passageway and a second passageway, and

22   the language of claim 11 which says the assembly of claim 11

23   wherein the feedthrough filter capacitor is asymmetrical.

24          Claim 12 incorporates claim 11 and incorporates

25   that description of feedthrough filter capacitor and the

1    Court can search the patent specification in its entirety

2    and that is the only description of feedthrough filter

3    capacitor that you will find.

4              Mr. Slifkin made reference to Figure 40 and

5    showed a drawing.  I would point the Court to the textual

6    discussion in the specification that describes Figure 40 and

7    it's at column 6 near the bottom third of the column.

8              THE COURT:  Is it in fact Figure 40 or is it

9    Item 40?

10             MR. WHETZEL:  Item 40.  I'm sorry, Your Honor.

11   Item 40, Figure -- it shows up in Figure 5 and perhaps in

12   other figures.

13             THE COURT:  Thank you.  The record is complex

14   enough for me.

15             MR. WHETZEL:  I apologize, Your Honor.

16             And in that discussion of the specification,

17   again consistent with the claim, the specification says that

18   the feedthrough filter capacitor has first and second sets

19   of electrode plates, a first passageway and a second

20   passageway.

21             Now, this hole for an RF pin is indisputably

22   not filtered, not connected to plates, not discussed or

23   disclosed anywhere in the claims or specification of the

24   patent and has nothing whatsoever to do with the function

25   of the claimed invention which is an internally grounded

1    feedthrough filter capacitor.

2           Now, there was a brief reference I heard to

3    perhaps the electrode plates themselves being asymmetrical.

4           Well, first, that is not the Court's claim

5    construction.  We're simply asking the Court to clarify,

6    with all respect to the Court, what the term non-ground lead

7    passageways meant in the construction.  And we submit that

8    within the scope of the claims and the specification that

9    can only mean first passageways.  That's the only structure

10   that is disclosed.

11          And I would also point the Court to the

12   specification at column 9, starting at line 9, with the

13   symmetrical relationship is described.  And it says,

14   "wherein the conductive terminal pins are symmetrically

15   positioned about a central ground pin."

16          We think it is very clear as a matter of law,

17   Your Honor, that the symmetry or asymmetry relationship

18   as defined in the patent and construed by the Court is a

19   relationship between the second passageway and the first

20   passageways.  And I don't think anyone can look at the

21   structure of accused devices and fairly argue the first and

22   second passageways in those devices don't have the mirror

23   plane relationship that establishes symmetry.  Therefore,

24   claim 12 cannot be infringed.

25          THE COURT:  It's been pointed out to me that

1    these are comprising claims.  Obviously, claim 11 expressly

2    is and claim 12 which depends on it would also be a

3    comprising claim.

4              Doesn't that lead to the conclusion that other

5    elements such as the RF pin could be included?

6              MR. WHETZEL:  Your Honor, other elements could

7    be included in the overall device.  But when we're looking

8    to find what the symmetry relationship is, I think we need

9    to look at more specifically the actual structure that is

10   claimed and the definition that is given to feedthrough

11   filter capacitor in the claim and with reference to the

12   specification and embodiments.

13             I could do a lot of things to the feedthrough

14   filter capacitor.  I could add a resistor to it.  I could

15   drill a hole in it.  I could do any number of things to it.

16   But that doesn't render it or affect symmetry or asymmetry

17   within the parlance of the '627 patent.

18             THE COURT:  And in your view, all of that,

19   regardless of whether you are right or wrong, is an issue I

20   should view as claim scope and resolve as a matter of law?

21             MR. WHETZEL:  Yes, Your Honor.

22             THE COURT:  So I am faced with a choice of

23   either a last minute construction or asking the jury to

24   resolve something that you think is a question of law.

25             MR. WHETZEL:  I'm afraid that is a position

1    we're in, Your Honor.  The asymmetry issue and the

2    indefiniteness came up when it came up, and we had the

3    benefit of the Court's construction now for a couple of

4    weeks now and we have moved on that as quickly as we can.

5            Fortunately, I don't think it's a particularly

6    difficult issue as compared to many of the other issues we

7    have grappled with in this case.

8            THE COURT:  Do you have anything to say about

9    the plaintiff's at least implicit request that I refrain

10   from ruling today until we finish the briefing at least in

11   the event that I'm not prepared to rule for them?

12           MR. WHETZEL:  Your Honor, we're on the eve of

13   trial.  We're moving as quickly as we can.  I guess the

14   only position that I would say is in a pretrial stipulation,

15   Greatbatch agrees that the design of the accused products is

16   known.  They point simply to the RF hole as compared to the

17   first and second passageways.  They state in the pretrial

18   that evaluating symmetry is not so technical if the Court

19   requires expert testimony to resolve the issue.  They asked

20   the Court to grant summary judgment in their favor on that

21   issue.  They addressed the issue.

22           If they want to put in additional papers, I

23   don't think it's going to meaningfully change the analysis

24   the Court has to go through or really add anything to what

25   the parties have presented this morning.

1          THE COURT:  All right.  Thank you.  Mr. Slifkin,

2     is there anything you want to add?

3          MR. SLIFKIN:  Yes, Your Honor.  With all due

4     respect to Mr. Whetzel, we would like an opportunity to

5     brief our side of the story.  It would be somewhat unfair

6     for the Court to rule against us when they filed their

7     opening brief and we haven't.

8          If the Court is going to look at the

9     construction, take another look at the construction, we may

10     have alternative constructions that we believe are better

11     than the ones they have proposed, including the ones that I

12     had referenced, and that is the electrode plates are part

13     of that capacitor.  We would like the opportunity to fully

14     brief that, if you are inclined to rule against us.

15          It is somewhat unfair to say here is their view

16     of how you should have construed your construction or what

17     your construction means and not allow us to look at that

18     construction and say we think the Court is correct but, in

19     the alternative, here is a different view of that construction.

20          And, again, we do think the Court got it right.

21     It's simple.  It's as one of ordinary skill in the art would

22     have construed that language.  "Asymmetrical" means "not

23     symmetrical," and then there are examples that are entirely

24     consistent with the language of the patent.

25          And, Your Honor, as I think you recognize

1    from one of the questions you asked, the claim language is

2    comprising.  The capacitor, the block of ceramic includes

3    some parts.  Some of those parts are the electrode plates,

4    but ultimately it is a monolithic ceramic capacitor, Item

5    No. 40 in the patent.

6                THE COURT:  Okay.

7                MR. SLIFKIN:  Thank you.

8                THE COURT:  Thank you.  I'm going to take all

9    of this that we have discussed under advisement.  I may well

10   have more to say about it before we leave today, but I have

11   nothing more to say about it right at this moment, and we

12   have many other things to cover.

13               So let's move on next to Greatbatch's motion for

14   sanctions.  We'll hear brief argument on that.

15               MR. MULDOON:  Your Honor, there was the issue of

16   the "ground lead conductively coupled to the ferrule" that I

17   thought you had in that.

18               THE COURT:  I think I misled you unintentionally

19   to suggest that that would be the next item.  I know that

20   is your request for supplemental construction.  We'll get to

21   that if we have time.  But I did want to move on to motion

22   for sanctions at this point.

23               MR. SLIFKIN:  Thank you, Your Honor.  This one

24   is mine as well.

25               One thing I would like to point out is

1    Mr. Scalise is here.  I may be talking about some attorney

2    eyes' only information regarding the construction of their

3    capacitor.  I leave it up to my ...

4              THE COURT:  Well, let's do this.  I have

5    carefully read the briefs.  I don't think you need to get

6    into that level of detail.  Just hit on the highlights

7    without getting into the attorney eyes' only information

8    as an initial matter.

9              MR. SLIFKIN:  I'm going to have to talk about

10   the size of a certain part inside the product, and I'll

11   leave it up to Mr. Cahill and Mr. Whetzel.

12             MR. CAHILL:  The size we think is not attorney

13   eyes' only.

14             MR. SLIFKIN:  Great.

15             THE COURT:  Okay.  Fine.

16             MR. SLIFKIN:  So from the information that we

17   have -- oh.  And, Your Honor, we have a timeline that I

18   would like to put up on the screen and I have given opposing

19   counsel a copy of it.

20             I have copies for the Court.

21             THE COURT:  Okay.

22             (Documents passed forward.)

23             MR. SLIFKIN:  Your Honor, from the information

24   we have, and it is somewhat inconsistent and unclear to us,

25   there was a problem with the pin washers discovered in

1    November of 2011 when the switch to palladium pins was made.

2              In the words of Mr. Rios, the solder was free

3    flowing to the gold.

4              I think given the Court's ruling on summary

5    judgment on the subset of the Ingenio parts, I think we now

6    understand that to mean the free flowing is an infringement;

7    when the solder touches the gold, it is an infringement.  So

8    the problem of this free flowing solder into the gold was

9    recognized.

10             And then from the information we have, the newly

11   produced documents that came out well after the close of

12   discovery, we know that the washer size was switched in the

13   production models to production units to 14 thousandths.

14   That was the fix that Mr. Rios referred to as though he was

15   unclear on the timing of the fix.  So the issue of the

16   washer size, although it seems like it is an insignificant

17   part, could not be more critical to your case.

18             THE COURT:  Well, hasn't your expert indicated

19   it is pretty insignificant and potentially irrelevant?

20             MR. SLIFKIN:  No, Your Honor.  If you look at

21   the language quoted in, they quote in their brief, he says

22   it directly affects the likelihood of infringement.  I don't

23   know how much more important it can be than a change that

24   affects the likelihood of infringement.

25             THE COURT:  They say there are essentially five

1    documents at issue.  Is that correct?

2              MR. SLIFKIN:  No, Your Honor.  We don't believe

3    so.  We believe that this reveals the fact that they have

4    not produced other documents as well.  In fact, we know that

5    there is a particular document that was modified, the one

6    with the shadow box, with the cut and paste on it.  We know

7    there is an earlier version that didn't have the cut and

8    paste on it.  We have never seen that document.  So they

9    have pasted over the washer size document and never gave us

10   the original.  So we're faced with a situation where the

11   testimony was confusing.  Mr. Rios testified both ways.

12             THE COURT:  Is it true that English is his

13   second language?

14             MR. SLIFKIN:  Your Honor, I don't -- I did not

15   depose Mr. Rios.  I don't doubt that is the case.  He seems

16   to be fairly articulate to me.  He clearly said that the

17   solder was free flowing into the gold.

18             This isn't a, this isn't a really complicated

19   issue with using large words.  It is simple English terms,

20   washer size, and solder, and gold.  Clearly, he knows what

21   those are.  He is an engineer in the field, dealing with

22   primarily an English-speaking employer on these topics.  So

23   I don't think that that is an issue.

24             If you look at the questions that Ms. Smalley

25   asked of him, clearly Ms. Smalley was under the impression

1    that production units had 16 thousandths washers.  Mr. Rios

2    agreed.  And then later on questioning by Mr. Hall, I believe

3    it was, changed his story to now it's 14 thousandths.  So we

4    were left with the impression.

5              Oh.  And Ms. Smalley was asking about a document

6    reflecting experimentation.  This is an experiment to see how

7    should we, what should we do with this washer size to solve

8    our infringement problem, and the production documents were

9    never given to us.

10             What I mean by production documents, documents to

11   produce the part in question were never given to us until they

12   needed to rely on them to defend against summary judgment.

13             So we didn't have the ability to test the

14   witnesses using the documents on the washer size, the change

15   in washer size because we didn't have them.

16             THE COURT:  Why would they conceal evidence that

17   is helpful to them?

18             MR. SLIFKIN:  Well, if you look at the timeline,

19   Your Honor, you will see that on December 3rd, 2013, it's the

20   first page of our timeline, we sent them a draft, amended

21   complaint, that puts the '715 patent at issue.  Sixteen days

22   later, the bottom right-hand box, they start checking into

23   making the washer size smaller.  It seems to me that they

24   desperately didn't want us to know that now that we've said

25   we're going to see you under '715 patent, they start looking

1    at, oh, maybe we should make it 14 thousandths or 15

2    thousandths.  Well, clearly they're testing 16 days after we

3    sent them the draft complaint.

4              THE COURT:  Why wouldn't they want you to know?

5              MR. SLIFKIN:  Because it begs the question what

6    were you doing before you changed the washer size?

7              THE COURT:  Are you suggesting they want to lull

8    you into expanding this lawsuit just so they could win it?

9              MR. SLIFKIN:  No, I'm suggesting they didn't

10   want us to be able to question the witnesses about why they

11   made the change or the timing of the change coming on the

12   heels of an amendment to include a new patent.

13             THE COURT:  Let's talk about the relief you are

14   seeking.  It does seem quite excessive even if you are right

15   about all of what they were doing.  Help me understand why

16   I should give you everything that you are asking for.

17             MR. SLIFKIN:  Well, Your Honor, I think

18   certainly we believe certain sanctions are needed here.  We

19   were deprived of the opportunity to take those washer size

20   documents and put them in front of the witnesses and ask

21   about why were the changes made?  Who made the change?  Are

22   there other communications about the change?  Were there

23   e-mails about change?

24             We just didn't know that they had made a

25   production change.  We have evidence of experimentation.  So

1    we were deprived of the discovery opportunity to ask these

2    witnesses a whole series of questions about the change.

3            If the Court has other sanctions, we would

4    certainly accept whatever the Court deems appropriate.  We

5    believe an alternative sanction would be to, on the

6    infringement of the '715 patent, to shift the burden of

7    proof to the defendants to prove they don't infringe.

8            Clearly, the 16 thousandths washers that were

9    causing infringement, the evidence is clear, as much as they

10   try to hide the fact in their papers about they mention some

11   larger washer size, they never used a larger washer size in

12   production.  It's either, it was either 16 thousandths or 14

13   thousandths.  The 16 thousandths allowed the solder to free

14   flow to the gold, according to Mr. Rios, and Professor

15   Webster.

16           THE COURT:  Well, why not just let this all play

17   out in front of the jury?

18           MR. SLIFKIN:  Well, Your Honor, again, we've

19   been deprived the opportunity to ask these witnesses

20   questions.  We now are faced with not knowing what Mr. Rios

21   is going to say or Mr. Panlener is going to say about the

22   change in the washer size, the difference of it, how long

23   the infringement was going on before they tried to fix it.

24           Thee is a substantial gap in time that has never

25   been explained from November 2011 to March or later 2014

1    when they fixed the problem.  That gap has never been

2    explained in any of their papers.  We have to hear it for

3    the first time from the witnesses on the witness stand.

4    It's somewhat unfair for us to have to react to that when we

5    could have asked about that gap, had we known they had made

6    a production change.

7              The confusion is evident not only from

8    Ms. Smalley's examination of Mr. Rios but my examination of

9    Mr. Webster where I put document after document in front of

10   him for the 16 thousandths washer size and says, each one of

11   these show 16 thousandths.  What documents do you have to

12   show 14 thousandths?  And he said he hadn't seen any.

13             Of course, counsel had those documents or

14   their client had those documents.  We were deprived of the

15   opportunity to put those documents in front of Mr. Webster

16   and say, isn't it a fact that there is a change made and you

17   examined products made after the change?

18             I mean that is yet another issue, Your Honor, is

19   the samples that we looked at, according to them, I believe

20   they say now the samples they gave us were 14 thousandths.

21   We never had an opportunity to test the 16 thousandths.

22             I know from their papers they handed to me

23   before the argument here, they're going to say the DPA

24   samples, the DPA samples were 16 thousandths, and you had

25   those.  Those are the same samples they're saying are

1    unreliable because of the DPA process.

2              What we're talking about, Your Honor --

3              THE COURT:  I understand.  Thank you.  Let me

4    give them a chance.

5              MR. SLIFKIN:  Yes, Your Honor.

6              THE COURT:  Thank you.

7              Good morning.

8              MR. CAHILL:  Your Honor, I have some slides, and

9    I'd like to hand them up.

10             THE COURT:  Okay.

11             (Documents passed forward.)

12             MR. CAHILL:  However, Your Honor, given how

13   tight we are on time, if there are specific issues that the

14   Court would like to inquire about, I'm happy to skip through

15   and simply answer questions.

16             THE COURT:  Well, I guess start with the

17   contention that this is at a minimum unfair that we're all

18   going to hear at trial evidently what your client's view is

19   as to when the design change occurred, why it occurred, when

20   infringement ended, and when it was ongoing.  Wouldn't that

21   be unfair to subject everyone to?

22             MR. CAHILL:  Well, none of that is exactly true,

23   Your Honor.  So the testimony is that there were parts that

24   failed inspection, driving up the defect rate, and that when

25   Mr. Rios analyzed those parts, he discovered that for those

1    parts -- this isn't for every part.  For those parts, the

2    solder had flowed through.  Those parts were scrapped.

3              There is no evidence that there was widespread

4    infringement.  That never happened.  In fact, throughout the

5    time period that we're talking about, AVX made primarily

6    platinum pin Ingenios for which there was never any problem

7    with the solder flowing through.  It was only for certain

8    palladium pins and certain parts where this phenomenon was

9    seen.

10             THE COURT:  When did you change to the 14

11   thousandths?

12             MR. CAHILL:  I believe that is early in 2014.

13   It's hard to tell exactly because new pin washers were being

14   ordered.  It's hard to tell exactly when they became

15   standard usage on the factory floor.

16             THE COURT:  And is that going to be part of your

17   defense in this case?

18             MR. CAHILL:  The date on which the pin washers

19   changed?

20             THE COURT:  Yes.

21             MR. CAHILL:  I don't think so, Your Honor.

22             THE COURT:  How about the fact that they changed?

23             MR. CAHILL:  It's a relevant fact.  And if I

24   could, I'd like to bring up one slide.

25             So this is from Greatbatch's primary expert,

1    Professor Pilgrim.  This is from his initial report.  And he

2    recognizes pretty clearly.

3              And, by the way, he investigated DPAs of

4    Ingenio, more than 150 of them, throughout the time from

5    2011 to 2015 and that is what he is talking about here.

6              There were two parts each from 87 lots.

7    Actually, one of them had a third part.  I think it came out

8    to some number of Ingenio parts that he reviewed.  And as he

9    correctly notes, the issue on infringement is not the size

10   of the pin washer.  The key issue is whether solder contacts

11   gold directly.

12             Now, he opines that he is able to tell from the

13   evidence that he has whether Ingenio parts infringed over

14   time.

15             We think that same evidence shows that they

16   don't.  That is the issue that is going to go before the

17   jury.

18             THE COURT:  But isn't the diameter or size of

19   this pin probative or at least arguably related to the

20   likelihood of that contact occurring and therefore there

21   being infringement?

22             MR. CAHILL:  It's relevant.

23             THE COURT:  It is relevant?

24             MR. CAHILL:  It is relevant.

25             THE COURT:  It is going to be an issue at trial,

1      isn't it?

2                  MR. CAHILL:  It's relevant, Your Honor.  We

3      expect it to be part of the evidence.

4                  THE COURT:  So how is it fair then to the

5      plaintiff that they be made to go forward having to face

6      that evidence when it was not produced in a timely manner

7      during discovery?

8                  MR. CAHILL:  Well, the evidence was produced in

9      a timely manner.  There were five documents that were not.

10     There was clear testimony that the pin washer size changed.

11                 THE COURT:  In or around early 2014?

12                 MR. CAHILL:  I don't know that the date was

13     specified.  There were testing.

14                 THE COURT:  Who is the witness that you say

15     clearly testified that it was changed?

16                 MR. CAHILL:  So two witnesses testified.

17     Roberto Rios testified.

18                 THE COURT:  Isn't it conceded that his testimony

19     was murky and unclear?

20                 MR. CAHILL:  No, it was not.  Not in any way,

21     shape or form.  I think it is crystal clear.

22                 THE COURT:  Okay.  Show me that.

23                 MR. CAHILL:  The one place -- and this is in

24     Exhibit F to our brief.  There is a section of Mr. Rios.

25     I'm sorry, it is not Exhibit G, it is Exhibit H.  There is a

1    section of Mr. Rios' testimony from pages 110 to 111.

2              And at 110, 11 and 12, Mr. Rios is asked:  And

3    the current Ingenio product the pin washer has an inner

4    diameter of 16 mils; correct?

5              And he says:  Uh-huh, right.

6              THE COURT:  Didn't your attorney say on the

7    record that the record got a little muddled and therefore I

8    want to clarify things?

9              MR. CAHILL:  So if I could just follow up a

10   little bit, Your Honor.

11             So Mr. Rios got it wrong there.  I think he

12   misunderstood the premise of the question and then starting

13   at the first line of page 111, this is seconds after that,

14   the question is:  Okay.  Are you currently using palladium

15   iridium?

16             That is in reference to the pins in the Ingenio

17   product.

18             And the answer is:  We're currently using that

19   with the 14 thousandths diameter washer ID, no split.

20             I don't know how it could be clearer than that.

21   That is what they're using.

22             THE COURT:  Is it true or untrue that your

23   attorney said on the record during that deposition that the

24   record was muddled?

25             MR. CAHILL:  He did say that.

1          THE COURT:  So how can I rely on this as the

2    clear disclosure by your client that there was a change in

3    the diameter?

4          MR. CAHILL:  Mr. Rios said it more than once,

5    and my partner did in fact go back with Mr. Rios and clarify

6    it.

7          THE COURT:  Who is the other witness that you

8    think made it clear?

9          MR. CAHILL:  Professor Webster.

10          THE COURT:  Who I thought indicated he had no

11   direct factual knowledge.  He is your expert.

12          MR. CAHILL:  His expert report clearly states

13   that the pin washer size was changed.  And he states that in

14   his report after discussing it with Mr. Rios and

15   Dr. Panlener.

16          THE COURT:  Was he then questioned in deposition

17   and indicated he had not seen any documents that supported

18   that?

19          MR. CAHILL:  I don't recall that question

20   specifically.  I do know that a number of documents were put

21   in front of him and he was asked the pin washer size and it

22   was 16 mils.

23          THE COURT:  You say on page 7 of your brief,

24   production of purchase orders, you write:  While it is true

25   that the produced core technical documents do not reflect

1      the pin washer change, it is not true, as AVX's witness

2      testified, that a design change did not occur.  The purchase

3      orders confirm the evidence already of record and were

4      produced only to combat Greatbatch's sweeping assertions on

5      summary judgment.  Right?  Do you recall all that?

6                  MR. CAHILL:  Do I recall?

7                  THE COURT:  I'm reading it from your brief.

8                  MR. CAHILL:  Yes.

9                  THE COURT:  Do you doubt that I'm reading that

10     from your brief?

11                 MR. CAHILL:  No, that is what the brief says,

12     Your Honor.

13                 THE COURT:  Isn't it significant that it is

14     admitted that the core technical documents do not reflect

15     the pin washer change?

16                 MR. CAHILL:  That is a fact.  That is why --

17     and, Your Honor, I am the one who went to try to sort this

18     out, and I'm happy to explain it to the Court.

19                 We were surprised in Greatbatch's summary

20     judgment briefing when they argued that the core technical

21     documents did not show the change and, therefore, we should

22     be precluded from arguing that the pin washer ever changed.

23                 I went back to the client and said, how could

24     this be?  How is it possible that the size of the pin washer

25     changed but the Ingenio drawings didn't change?

1          And it actually took them a couple of weeks to

2     figure it out.  The conclusion that they came to was in fact

3     they did make the change off spec.  That they needed to make

4     the change because the defect rate was up, the yield rate

5     was down.  Their customer was not going to be happy with

6     that, but they knew it would take a significant amount of

7     time in order to get an engineering change order through to

8     change the drawings.

9          So they talked to Boston Scientific about it and

10    simply made the change, and it wasn't reflected in the core

11    technical documents.

12          THE COURT:  Is that explanation in the record?

13          MR. CAHILL:  So ... not stated exactly like that.

14          THE COURT:  Is it part of what you intend to

15    present at trial?

16          MR. CAHILL:  At trial, our witnesses will say

17    that the change was made and that the Ingenio drawings were

18    not changed.

19          THE COURT:  Will they say the reason for it had

20    to do with the high number of errors and Boston Scientific

21    and all of what you just outlined for us?

22          MR. CAHILL:  So I think everything that I said

23    was said by Mr. Rios on his deposition except for the part

24    about talking to Boston Scientific, which I'm not sure we

25    would be able to put in at trial.  But, in fact, he talks

1    about the defect rate and generating scrap and that was the

2    problem and that is why the change was made.

3                THE COURT:  Does the record show that any

4    portion of the reason for changing the size here was to

5    avoid infringement?

6                MR. CAHILL:  No.

7                THE COURT:  We didn't get through much of the

8    timeline, but I'm sure you are familiar with it and a lot of

9    it is outlined in the papers.  There is a suggestion that

10   what was going on here on your part was you knew they were

11   looking to amend their complaint and to avoid infringement

12   right at that same amount, same period of time generally,

13   you were undertaking these efforts to change the size here.

14   Respond to that.

15               MR. CAHILL:  This change was driven by Mr. Rios

16   who was not involved in the lawsuit other than as a document

17   custodian who we interviewed and his documents to be collected.

18   He made this change because there was too much scrap, the

19   yield rate was coming down, and it was his job to fix that.

20   And that is why the change was made, not for any other reason.

21               THE COURT:  There is a suggestion that you all

22   modified one of these drawings.  What is response to that?

23               MR. CAHILL:  So my understanding is that Mr.

24   Rios modified the drawings when he ordered the modified pin

25   washers.

```
 1                    THE COURT:  And was it clear in production that

 2     you had made a modification or was it an effort to mislead

 3     the plaintiff?

 4                    MR. CAHILL:  Certainly, there was no effort to

 5     mislead ever, Your Honor.  I had produced those documents

 6     myself.  There was never any intent on anyone's part to

 7     mislead anyone.  We produced all of the documents that the

 8     client gave to us when I went to them and said are there

 9     documents that show when the pin washer changed?  They gave

10     me -- they figured out that purchase orders was probably the

11     best way to figure it out.  They went and found some of the

12     document in the basement in the file cabinets and sent them

13     to me and I produced them.

14                    Now, what the drawings reflect is Mr. Rios

15     ordering different sizes of pin washers by taking a pin

16     washer drawing and changing the dimensions.  That is what he

17     did.  That is how he ordered them.

18                    THE COURT:  Did the plaintiffs know that those

19     documents that you produced involved a change to the drawing

20     or did they have to just figure that out themselves?

21                    MR. CAHILL:  I think they figured it out

22     themselves but I didn't figure it out until they figured

23     it out.

24                    THE COURT:  Is there anything else?

25                    MR. CAHILL:  No.  If the Court is happy, I'll
```

1    sit down.

2              THE COURT:  Thank you.  Okay.  Is there any

3    response?

4              MR. SLIFKIN:  I'll try to be brief, Your Honor.

5    I know we've got a lot to do today.

6              I'd like to invite the Court's attention, after

7    I get the technology to work -- (Elmo settings adjusted) --

8    to Professor Webster's report, paragraph 273, last sentence

9    on that page:  AVX and BSC finally settled on using split

10   solder preforms and 15 thousandths pin washers.

11             So for them to say that the record is clear,

12   we know what size pin washers were being used, Professor

13   Webster, after speaking to presumably to Mr. Rios, now says

14   it's 15 thousandths, we don't have any documents showing 15

15   thousandths.

16             I'd also like to invite the Court to look at our

17   reply brief, page 7.

18             "Question:  And in the current Ingenio products

19   the pin washer -- let me emphasize in the current Ingenio

20   products, the pin washer has an inner diameter of 16

21   thousandths.  Correct?

22             "Answer:  Uh-huh.  Right."

23             Again, as the Court I think recognizes, as Mr.

24   Hall recognized, the record is muddled.

25             He is saying yes.  And that is a question that I

1    think is not unclear or difficult for somebody to understand

2    even if English is their second language.

3              What is the current inner diameter?

4              Sixteen thousandths was the answer.

5              A couple of other minor points.  We still don't

6    know, we still don't have an explanation for the discovery

7    in November of 2011, and the fix in April or March of 2014.

8    Yet again, AVX has declined to explain how this gap, this

9    huge gap in time can exist.  If Mr. Rios was concerned about

10   the scrap rate, what was he doing for two years and two or

11   three months about it?

12             Scrap or defects is another word for infringement,

13   Your Honor.  It is solder reaching the gold braze.

14             THE COURT:  Well, we're told now it was all

15   driven by customers, and that was when they happened to

16   receive sufficient number of complaints from their customer

17   that they decided to do something about it.

18             MR. SLIFKIN:  That may be, Your Honor.  It would

19   have been nice for us to know about that so we could have

20   asked Boston Scientific about it and so we could have

21   requested communications between Mr. Rios or others with

22   Boston Scientific on the topic.

23             I also point out, Your Honor, that we have

24   document requests specifically mentioning the part number

25   of the washer.  Those documents were not produced during

1    discovery.  Those are the documents we got after the close

2    of discovery in the middle of summary judgment briefing,

3    and the requests can't be more clear.  They mentioned the

4    part number, pin washer, part number, and those were never

5    produced to us during fact or even expert discovery.

6            Nor were certain process specifications, 2046,

7    Revisions N,O,P&Q were never given to us.  We have M and we

8    have R.  We are missing the ones in between.  And we believe

9    there is ones after R that deal with what they now claim is

10   an unsplit washer when Revision R says to split the washer.

11   We don't have process specs.

12           What they do say is there was some off spec

13   change.  That is attorney argument.  They declined to give

14   us a declaration from a witness who could say whether or not

15   it was an off spec change.

16           The language in the brief says they could have

17   testified, not they would have testified, about the off spec

18   change.  They could not have.  They don't know.  Maybe

19   we'll learn at trial, but unfortunately we have to request

20   those questions for the first time when we confront the

21   witnesses at trial.

22           THE COURT:  All right.  Thank you.  We'll come

23   back to this.  Let's move on to, there is one motion in

24   limine I want to hear brief argument on.  That is AVX's

25   Motion in Limine No. 1 to preclude evidence of secondary

1    considerations of nonobviousness.

2              So let me hear from AVX on that first, please.

3              MR. RAWNSLEY:  Thank you, Your Honor.  AVX served

4    two interrogatories directly asking what are your contentions

5    on secondary considerations?  The language of those

6    interrogatories, although they make brief reference simply

7    to names of what are acknowledged secondary considerations,

8    they say we will provide our contentions to you at some other

9    point.  We never received any supplement explaining what the

10   contentions on those secondary considerations were.

11             THE COURT:  Did you ever come to me and complain

12   their interrogatory responses were inadequate?

13             MR. RAWNSLEY:  We did not.

14             THE COURT:  And so why should I not treat this

15   as simply too late of a complaint?

16             MR. RAWNSLEY:  Well, because secondary

17   considerations is an issue on which they would bear the

18   burden.  As we set forth in our expert testimony, in the

19   expert reports, it said this is our prima facie case of

20   obviousness.  The burden now goes to you to let us know

21   if you are going to try to rebut under secondary

22   considerations.  That was explicitly set forward.

23             Not one of the expert reports we received in

24   response actually addressed secondary considerations from

25   the plaintiff.

1          THE COURT:  Now, they do point to at least 300

2     plus pages of places where the evidence that they want to

3     now characterize as secondary considerations was in the

4     record in front of you in a timely manner.  Do you disagree

5     that you had all of that evidence in a timely manner?

6          MR. RAWNSLEY:  We do not disagree those were

7     documents produced during fact discovery; and to the extent

8     they were produced within the deadlines, it is true that

9     they were produced in a timely manner.

10          THE COURT:  So why isn't that enough?  You

11     knew they had secondary considerations in mind from their

12     admittedly vague responses to your interrogatories.  You

13     didn't come and ask for more specific interrogatories from

14     the Court, and you have all the evidence that they want to

15     use.  Why, when I weigh all that, shouldn't I say let's deal

16     with it, let's hear this evidence at trial.

17          MR. RAWNSLEY:  Because of the fact we don't

18     have the evidence we want to use.  Because issues such as

19     commercial -- let's take commercial success, for instance.

20     Simply their evidence that they cite for commercial success

21     is simply a spreadsheet.  That is something that requires

22     expert testimony.  That is something that necessarily is

23     going to require expert testimony to put in context and

24     explain.

25          They say simply because we sold this product,

1   here are the numbers.  That puts nothing in context.  That

2   is annum are tore.  There is no denominator.  There is

3   nothing to explain to the jury.  And we have been deprived

4   because they did not put in expert testimony on the an issue

5   they bore the burden.

6           We now have no expert testimony in the record

7   that would allow us at trial to rebut that.

8           THE COURT:  All right.  Thank you.  Let me hear

9   from Greatbatch.

10           MR. MULDOON:  Your Honor, the secondary indicia

11   of nonobviousness, as the Court has recognized, there is

12   300 pages, over 30 exhibits going to deposition testimony.

13           THE COURT:  All right.  But it is true that

14   the first time you ever characterized that as evidence in

15   support of secondary considerations is in the motion in

16   limine response?

17           MR. MULDOON:  Your Honor, as the local rules

18   made clear, the specificity with which someone asks or

19   answers questions is often related to the specificity with

20   which that party responds to interrogatories.

21           Had this been made as a motion at the time

22   that this is somehow unfair, we could have gone through and

23   shown a number of interrogatories that were at least as

24   vague and nonresponsive, at least vague as our interrogatory

25   presently.

1          THE COURT:  So you agreeing the first time any

2     of us would have understood this is the evidence you intend

3     to present as part of your secondary considerations is in

4     your response to the motion in limine?

5          MR. MULDOON:  No, Your Honor, I don't.  Robert

6     Beckman, financial specialist at Greatbatch, had testified

7     with respect to sales of specific items both in this action

8     and in the related IPR proceeding.  He submitted a

9     declaration there pursuant to an e-mail agreement between

10    Mr. Whetzel and myself.

11         The testimony provided in the IPR was equally

12    available and usable in this proceeding.  So Mr. Beckman's

13    testimony and the arguments with respect to commercial

14    success of specific models was presented in that case and

15    argued in the IPR.

16         THE COURT:  At what point did the defendant first

17    learn that Mr. Beckman's testimony was going to be used by the

18    plaintiff as part of its secondary considerations showing?

19         MR. MULDOON:  His declaration I believe was

20    submitted in January 15, I believe, Your Honor.

21         THE COURT:  Does it indicate it has anything to

22    do with secondary considerations?

23         MR. MULDOON:  Yes, Your Honor.  And the patent

24    owner's response in the IPR, there is a reference to secondary

25    indicia of nonobviousness on commercial success that cites

1    to Mr. Beckman's very short declaration regarding sales of

2    specific part numbers.  There are also interrogatory responses

3    that identify all of the components that are practicing the

4    patents, that are manufactured by Greatbatch and substantial

5    sales volumes regarding the sales of each of those items.

6         There is testimony that was taken of Mr. Marzano

7    and Mr. Seitz regarding Greatbatch's practice of designing

8    in the specific technology that it has patents on into the

9    products.  That was covered in depositions, portions of

10   which are present.

11        Clearly, the nexus, the tying of the patented

12   products and the commercial success were set forth in

13   numerous documents as well as referenced in Mr. Strickland's

14   report with respect to commercial success of products that

15   is mentioned I believe in Mr. Strickland's report.

16        And even in the patent itself, there is evidence

17   of disclosure of unexpected results in the specification

18   with respect to the tendency of the body to absorb certain

19   RF frequencies that permit the 267 internally grounded

20   filter capacitors to work in this type of application.

21        THE COURT:  Do you have any expert opinion that

22   has been disclosed with respect to secondary considerations?

23        MR. MULDOON:  I believe that Mr. Stevenson's

24   expert report deals with I believe some -- I'd have to -- I

25   don't recall the specifics, but I believe there is both

1    evidence of secondary indicia of nonobviousness in both Mr.

2    Stevenson and Mr. Strickland's report that are tied to those

3    issues.

4              THE COURT:  So if I deny their motion, your

5    intent is to present expert opinion through Mr. Stevenson

6    and Mr. Strickland to support your showing of secondary

7    considerations of nonobviousness?

8              MR. MULDOON:  Well, also obviously people from

9    Greatbatch who will support both the sales of the identified

10   products that Greatbatch manufactures that incorporate the

11   patented technology and the individuals who routinely assess

12   those issues and intentionally design the technology into

13   Greatbatch's products.

14             THE COURT:  Right.  But all of those are fact

15   witnesses; correct?

16             MR. MULDOON:  Those are fact, yes.

17             THE COURT:  But in terms of, the suggestion from

18   the defendants is you have no expert opinion disclosed in

19   the context of secondary considerations of nonobviousness.

20   And you say that is incorrect.  We have Stevenson and

21   Strickland.

22             MR. MULDOON:  Yes, Your Honor.

23             THE COURT:  All right.  Thank you.  Let me hear

24   the reply.

25             MR. RAWNSLEY:  Briefly, Your Honor.  There has

1    been no agreement to use everything in the IPR as if it

2    were in this litigation.  There was agreement solely as to

3    Professor Stevenson's testimony.  I don't believe the

4    declaration -- I could be wrong on this but I don't believe

5    that the declaration he was referring to of Beckman from the

6    inter parties review has even been entered into the record

7    in this case.  Mr. Beckman in this case is simply one of

8    many fact witnesses.

9              THE COURT:  Whatever the agreement is, you agree

10   it is embodied in an e-mail?

11             MR. RAWNSLEY:  Well, it is in a letter before

12   the Court.  It's been submitted to the Court.

13             THE COURT:  Okay.  But whatever it is, it's in a

14   document.

15             MR. RAWNSLEY:  Correct.  Correct.

16             THE COURT:  Okay.

17             MR. RAWNSLEY:  Yes.  And there is no agreement

18   as to everything in the IPR comes into this.  As I said,

19   Beckman in this case is a fact witness.  I'm not aware of

20   Professor Stevenson testifying as to secondary consideration.

21   Just pointing to the '627 patent to say there were results,

22   there has been no indication that those were unexpected

23   results.  We certainly weren't aware of any, and we would

24   have put in expert testimony to the contrary, had we had any

25   opportunity to know that that was coming.

 1                    And as to Strickland's report, they insist there

 2      was commercial success.  Again, that depends on nexus, that

 3      depends on a showing that their products practice claims of

 4      this patent.

 5                    I ask Your Honor to follow the footnotes where

 6      he says that our parts practice this.  Follow the footnotes

 7      and see if there is any technical expert testimony from a

 8      Greatbatch expert that underlies those assertions.  There is

 9      none.

10                    THE COURT:  All right.  Do you happen to know

11      where in the record we could find this agreement regarding

12      the IPR?  If you don't, I'll give you time to look for it.

13                    MR. RAWNSLEY:  Yes.  I'll be able to get it to

14      you briefly.  It was in a letter submitted to Your Honor.

15                    THE COURT:  Okay.

16                    MR. RAWNSLEY:  And just one final response.  To

17      date, we still don't know what their secondary considerations

18      are.  We would like to know, if this were going to go forward,

19      exactly which claim they're asserting is practiced by which

20      patent and which secondary considerations, which nexus applies

21      to which.  We still don't know that.

22                    Their response to our motion in limine is the

23      interrogatory response that they should have provided more

24      than a year ago.

25                    THE COURT:  Is there anything further on this

1    one?

2                    MR. MULDOON:  No, Your Honor.

3                    THE COURT:  All right.  Let's talk about one

4    more issue and then we'll take a break.  Let's now come

5    to the request for supplemental claim construction that

6    Greatbatch requests.

7                    MR. MULDOON:  May I approach with a few slides,

8    Your Honor?

9                    THE COURT:  Yes, you may.

10                   MR. MULDOON:  Your Honor, as the Court may

11   recall, claim construction back in November of last year,

12   the issue with respect to conductive coupling dealt

13   primarily, if not solely, with whether or not it was to

14   include capacitive coupling.  And that construction was

15   limited to the various references with respect to variations

16   of conductive coupling, conductively coupled, and all the

17   various tenses.

18                   Well, after the Court had issued that

19   construction, which we believe is absolutely correct with

20   respect to what conductive coupling is, we are not asking

21   to have the Court change that construction with respect to

22   conductive coupling.

23                   The dispute with respect to the claim limitation

24   is now a ground lead conductively coupled to the conductive

25   substrate.  As it became apparent during the summary

1    judgment briefing where this issue was addressed with

2    respect to certain items of prior art, we do not believe

3    that, and which the Court has ruled there is questions of

4    fact as to whether they are prior art, but we believe it

5    would not be appropriate on both a motion in limine and on

6    our representation on our motion for AVX to represent in

7    questions or testimony that these various prior arts satisfy

8    that claim limitation by covering a structure that is

9    discussed in the patent in at least four different locations

10   and described as being eliminated by the novel aspect of the

11   present invention.

12             THE COURT:  Are you essentially asking us to

13   find a disclaimer now in your patent?

14             MR. MULDOON:  Yes, Your Honor.  We believe that.

15             THE COURT:  And did you ask me that when you

16   proposed the construction that I adopted?

17             MR. MULDOON:  It wasn't at issue with respect to

18   the term until it was put in the context of the ground lead

19   limitation that was, has become an issue of disputed claim

20   scope since motion briefing was last summer, Your Honor.

21             THE COURT:  All right.  Try to show me briefly

22   then how I could find this disclaimer that you now see in

23   your patent.

24             MR. MULDOON:  Yes, Your Honor.

25             The slides, please.

1          The patents-in-suit in the specification has, in

2     several locations, it identifies with respect to column 3,

3     and the line numbers aren't here.  It's at the bottom of

4     column 3.

5          In particular, novel capacitor assembly is

6     needed that is subjected to far less temperature rise during

7     the manufacture thereof by eliminating an outer perimeter or

8     outside diameter electrical/mechanical connection.

9          Then moving on to the sentences that bleed

10    from, carry over from the bottom of claim 4 into claim 5,

11    the internally grounded monolithic feedthrough filter

12    capacitors utilized in the assemblies of the present

13    invention advantageously eliminate the need to conductively

14    couple a metallized exterior surface of the capacitor to a

15    portion of the conductive substrate or ferrule, as was

16    required in the prior art.

17          Moving over to the top of column 7.

18          The invention as described herein eliminates the

19    need for external conductive connections between the

20    capacitor and a ground by connecting the internal ground

21    plates to a ground pin, tublet or similar ground lead

22    structure.

23          Then finally in claim 10 of the specification

24    talks about the significant advantage of the novel

25    internally grounded feedthrough capacitor assemblies, that

1   the mechanical and electrical connection to the outside

2   diameter of the capacitor is eliminated.

3           This point, Your Honor, was carried over into

4   the Office Action of August 19th in the prosecution history.

5           That is viewable on the next slide.

6           That again shows that they're talking about

7   it's clear that the internally grounded feedthrough filter

8   capacitor of the present invention differs in an important

9   and novel aspect, namely, that the ground plane electrodes

10  are internally grounded to a capacitor through ...  This is

11  in marked contrast to the prior art, wherein the ground

12  plane electrodes are grounded at the outer diameter or outer

13  periphery of the capacitor.

14          It even indicates this is what we talked about

15  throughout the application, the specification, in four

16  different locations that the claims are directed towards.

17          We believe that all of these points, a couple

18  of them would have been a clear disclaimer that the internal

19  grounding of the ground lead of the feedthrough filter

20  capacitor is accomplished by the ground lead being both

21  conductively coupled to the second plates as well as to

22  either the ferrule or the conductive substrate as set forth

23  in the various claims.

24          Plaintiff's interpretation of that collapses

25  both of those distinct limitations of the ground lead

1    limitation elements into a single one.  That the ground

2    lead pin not only is coupled to the second planes but those

3    electrodes are there also used to externally ground the

4    part that has consistently been described as an internally

5    grounded part and distinguished as the invention eliminates

6    that external ground capacitor connection and the benefits

7    that that provides.

8         We are not requesting that the Court require

9    non-metallized external surfaces of the capacitor as in

10   claims 2 and 22.  That is a different benefit that is

11   discussed elsewhere.  Here, it is the fact that the ground

12   lead is eliminated to allow for a reduction in the

13   mechanical and thermal stresses on a capacitor and to

14   provide a means for helium lead detection that are disclosed

15   in specific paragraphs in column 10 of the patent.

16       Therefore, in light of the dispute that has arisen

17   over the claim construction, a ground lead conductively

18   coupled to the conductive substrate cannot be construed as

19   to include solely an external ground connection through the

20   exterior perimeter of the capacitor.

21       THE COURT:  All right.  Thank you.  Let me hear

22   from the defendants.

23       MR. WHETZEL:  I'll try to be brief, Your Honor,

24   in the interest of time.

25       First, this isn't a new issue.  It should have

1    been raised at claim construction.  It was a legitimate

2    issue.  We submitted in June of 2014 our initial invalidity

3    contentions.  They're attached to our MIL No. 3.

4            In those contentions, we very clearly set forth

5    the conductive coupling structure and arrangement that we

6    believe is found in the prior art devices.

7            Interestingly, in September of 2014, Greatbatch

8    went to the Patent Office with a reissue application which

9    is also cited in our papers and they sought a new dependent

10   claim that would include essentially the limitation that

11   they're asking this Court to import into claim 12 -- I'm

12   sorry -- into claim 11.

13           Claim 11 is a very broad claim, Your Honor.  Your

14   Honor has construed the operative language, "conductively

15   coupled."  You adopted Greatbatch's construction.  And the

16   one thing we didn't see during plaintiff's presentation this

17   afternoon was the language of claim 11, and I would invite the

18   Court's careful scrutiny of that language.

19           Interestingly, their own expert has testified

20   that any electrical conductive path between the ground pin

21   and the ferrule would constitute a conductive coupling.  And

22   that testimony is also set forth in our papers.

23           The entire fact, prior art disclosure and

24   expert discovery in this case has been predicated on the

25   Court's claim construction to inject this new position,

1    this new issue would be both untimely, prejudicial, and, in

2    addition, it's not supported by the language of the claim or

3    by the language of the patent.

4          Greatbatch is asking the Court to import a wholly

5    new limitation into a very broad claim, claim 11.  It's a

6    little hard to even parse the language they suggested.  But

7    as best I can tell from their brief, the language they're

8    asking the Court to insert is along the lines of wherein the

9    conductive coupling excludes pins that are not connected to

10   the substrate independently of the capacitor.

11         That is classic dependent claim language, Your

12   Honor.  That is not construing what "conductive coupling"

13   means.  That is adding new limitation to narrow and

14   circumscribe the electrical path of the physical locations

15   for that conductive coupling.  We urge the Court to reject

16   these belated and untimely efforts to rewrite the claim as

17   unsupported by either the language of the claim or the

18   specification.

19         As to the claim scope disavowal argument, Your

20   Honor is keenly aware of the very strict standard to find

21   claim scope disavowal based on recent opinions the Court has

22   issued.

23         The standard for finding implicit standard is

24   exacting and it must be so clear it disclaims it explicitly.

25         On its face, the argument that frankly the claim

1    scope is disclaimed in the prosecution history conflicts

2    with Greatbatch's argument that that limitation is somehow

3    found in the scope of claim 11.

4              Finally, as to the prosecution history document

5    where they distinguished the '095 patent, Your Honor,

6    Greatbatch is confusing the presence of an internal ground

7    connection, which is what the '627 patent is about, with the

8    absence of metallized exterior surfaces which admittedly is

9    found in certain dependent claims and other claims of the

10   patent, one independent claim, each of which coincidently

11   have been invalidated by the PTAB.  That limitation is not

12   found in claim 11, and we respectfully urge the Court not

13   to import it into claim 11, particularly at the 11th hour.

14             Thank you.

15             THE COURT:  Thank you.  Brief rebuttal.

16             MR. MULDOON:  Yes, Your Honor.

17             Again, my opponent is attempting to read

18   additional claim limitations into our position here.  We have

19   never asserted that as the absence of non-metallized surfaces

20   that is a required claim limitation.  They can be there.  They

21   just can't be used to make the external electrical connection

22   of the outer perimeter of the capacitor to the conductive

23   substrate or the ferrule.

24             We suggest that the claim language, the term be

25   construed such that the conductive coupling of the ground

1    lead to the conductive substrate be independent of an

2    external electrical connection of the capacitor.

3                THE COURT:  All right.  Thank you.  So we're

4    going to take a break.  You're free until 1:00.  I'll come

5    back as close to 1:00 as I can, and we'll be done by 2:00

6    o'clock.  We will be in recess until at least 1:00.

7                (Brief recess taken.)

8                *      *      *

9                (Proceedings reconvened after recess.)

10                THE COURT:  Have a seat.

11                All right.  So you all have said a lot.  Let me

12    say a few things pretty much focused on the issues that have

13    already been discussed today.

14                So, first, we have the defendants' motion for

15    reargument and clarification and the related issues regarding

16    the '627 patent and infringement.

17                Having reviewed the briefing and the record

18    such as it is at this point and heard the argument, I have

19    decided to deny the defendant's motion because the Court

20    hereby rejects AVX's position.  That is, the Court is not

21    resolving infringement as a matter of law in favor of the

22    defendant, so there will be no summary judgment of

23    noninfringement on the '627 patent.

24                Symmetry, in the Court's view, is not

25    necessarily and always evaluated with respect to the first

1    and second passageways.  This is all in the context of claim

2    12 of the '627 patent.  There is no disclaimer in the patent

3    or any other basis to limit the claim scope in the way that

4    the defendants motion argues.

5              Further, another way to put it, is the Court

6    is not persuaded that as a matter of law, the hole of the

7    feedthrough filter capacitor is what we talked about as

8    being a dashed line box in the figure at page 5 of the

9    motion.

10             So the Court's Order is to deny the defendants'

11   motion.  There will not be summary judgment of noninfringement.

12             Whether, however, the '627 patent infringement

13   question is a question of fact for this jury or whether

14   instead it can, and should be, resolved as a matter of law

15   in favor of the plaintiff is an issue I have not decided,

16   and it's an issue that I hereby direct the parties to meet

17   and confer on.  And I would like your proposals tomorrow as

18   to whether or not you are in agreement on whether it is a

19   fact question or a question of law.  And if you are not in

20   agreement, then I would like your proposals on what, if any,

21   additional briefing or assistance you will give me on how I

22   resolve that now somewhat narrowed question.

23             I turn next to Greatbatch's motion for sanctions.

24             This motion is denied but without prejudice to

25   be renewed at trial consistent with my comments now.  And

1    those comments begin by I am certainly troubled by much of

2    what is alleged in the motion and particularly concerned to

3    learn only in connection with the motion I think in part

4    even just today what appear to be basic facts about why this

5    design change was made, when it was made, and that at least

6    in the defendants' view, the change had nothing to do with

7    a concern about infringement or setting up a noninfringement

8    defense.

9            I'm certainly concerned that the plaintiff may,

10   if the defendant is left free to do as it evidently wishes

11   to do at trial, the plaintiff may be unfairly prejudiced at

12   trial by learning material information that should have come

13   out in discovery only during the course of trial.

14           That said, I'm not yet persuaded that the

15   plaintiff cannot get a fair trial with respect to this patent.

16   I believe it's the '715 patent.

17           Part of what I'm going to do in an effort to

18   ensure hopefully a fair trial to both sides is I will treat

19   as relevant all of this back and forth about discovery, the

20   various disputes, what was produced and when, what was not

21   produced, whether a witness was clear or not in a deposition,

22   all of that which I would believe under normal circumstances

23   would be irrelevant because it is essentially an opportunity

24   to refight discovery disputes in front of the jury, I believe

25   in the circumstances of this case, all of that is likely to

1    be relevant and admissible because I imagine it will be

2    probative of what weight the fact-finder should give to each

3    side's showing with respect to infringement or noninfringement

4    of this patent.

5           The requested relief from the plaintiff,

6    however, in its motion, and even today, is too broad.  I'm

7    not going to shift the burden of proof to the defendants.

8    I'm not going to deem that all products before the change

9    were necessarily infringing.  And I'm not going to deem as

10   a fact that there was no design change when we all now know

11   there was a design change.

12          If the plaintiff believes that additional

13   relief narrower than what it has asked for to this point is

14   warranted by how things play out at trial, the plaintiff

15   will have to ask for that relief at trial.

16          That takes me now to the motions in limine.

17   I'll start with the one that was argued, AVX's Motion in

18   Limine No. 1 to preclude Greatbatch from offering evidence

19   regarding secondary considerations of nonobviousness.

20          This motion is granted.  In the Court's view,

21   there was not full, fair and proper disclosure in connection

22   with discovery, particularly in response to interrogatories

23   of the plaintiff's position with respect to secondary

24   considerations, an issue on which the plaintiff bears the

25   burden.

1          Having reviewed the materials that the parties

2     provided and heard the argument today, I remain unconvinced

3     that the handling of this issue by the plaintiff is

4     consistent with what we expect under the Rules of Civil

5     Procedure which ultimately is to make sure that nobody is

6     surprised when they get to trial as to what the other side

7     is trying to prove.  And I'm afraid were I not to grant this

8     Motion in Limine No. 1, that would be the result.  So the

9     Motion in Limine No. 1, AVX's Motion in Limine No. 1 is

10    granted.

11          Let's talk about the remaining motions in limine

12    which were not argued.

13          To preclude negative references to the number

14    of samples of accused products available to Greatbatch, that

15    motion is denied.

16          The plaintiff tested the three samples made

17    available to it of the Ingenio product.  Evidently, that

18    was not enough for a statistical analysis.  And I do recall

19    there was a lot of litigation over the course of discovery

20    about the plaintiff's access to parts and what the

21    defendants needed to produce.  The plaintiff essentially

22    argues that the defendants, despite my ruling, stonewalled

23    and the defendants argues essentially that the plaintiff

24    strategically refused to examine more parts that were made

25    available.

1           All I can say is having relived all of this in

2    the course of reviewing the motion as well as having lived

3    it in real-time, I made the rulings I made.  I tried to be

4    fair to both sides.  It's unclear to me even today that one

5    side or the other was in whole or in substantial majority

6    the good guy or the other was the bad guy.  And so under

7    these circumstances, A, I'm not going to preclude the

8    parties from arguing whatever they want to argue regarding

9    the number of products that were made available to

10   Greatbatch.

11          I think in fairness, both sides should be able

12   to make their argument.  We only had three.  We wanted more.

13   They didn't give us more.  We offered them more.  They

14   didn't take up the opportunity.  You can put all of that in

15   front of a jury, if you want.  I think it is all probative

16   of the weight that the fact-finder may give to the evidence,

17   for instance, the evidence regarding testing and whether or

18   not there is infringement and, if so, how far does that

19   infringement go.

20          I believe it is relevant.  The Rule 403 balance

21   is admittedly a very close call.  Generally, I would not let

22   you refight discovery battles in front of a jury, but for

23   the reasons I stated in connection with the motion for

24   sanctions and now more specifically in connection with this

25   motion, I think this is the unusual case where on balance

1    the probative value of putting these discovery disputes

2    before the jury outweighs the risk of unfair prejudice,

3    confusion and the other concerns of 403.

4              Next is Greatbatch's Motion in Limine No. 2 to

5    preclude AVX from presenting undisclosed expert opinion.

6    This motion is denied in part and granted in part.

7              I should say I think it would be within my

8    discretion to deny the motion in whole on the basis that it

9    is really at least three different motions combined into

10   one, but I'm not denying it on that basis.

11             It is, however, denied with respect to Dr.

12   Panlener.

13             This witness has relevant factual evidence based

14   on his experience and will be permitted to testify as a fact

15   witness on issues, for example, and these are just examples,

16   development and testing of the accused products, and the

17   existence of certain prior art.  He has direct factual

18   experience and knowledge that he is qualified to testify

19   about on those issues.

20             He will not, however, be permitted to testify as

21   an expert and express an opinion, for example -- and, again,

22   just an example.  He will not be permitted to compare the

23   prior art to the claims of the patent-in-suit.

24             If at any point Greatbatch believes that AVX is

25   crossing the line I am setting, they can object to specific

1    questions at trial.

2              With respect to Dr. Webster, the motion is

3    granted in that Dr. Webster, like all experts, will not be

4    permitted to testify to opinions that are not disclosed in

5    his report or declarations or deposition testimony.  I will

6    implement that principle equally at trial with respect to

7    both sides.

8              And I note just because the Court did not

9    strike a particular obviousness combination does not mean

10   that every or any expert necessarily gets to testify about

11   it if he or she did not previously and properly disclose an

12   opinion with respect to that combination.

13             Finally, with respect to Dr. Webster, the motion

14   is also granted in that he will not be permitted to testify

15   on indefiniteness, nor will anyone else that the Court has

16   resolved that the patent is not indefinite as a matter of

17   law, which is an issue I think we made clear in our summary

18   judgment motion -- or summary judgment opinion.

19             That takes me to Greatbatch Motion in Limine No.

20   3, which is to preclude evidence or argument regarding the

21   IPR with respect to the '627 patent.  This motion is granted

22   in part and denied in part.

23             I should actually say the only extent to which

24   it is denied is that the parties have evidently reached a

25   stipulation that just because evidence was presented in the

1    IPR doesn't per se make it inadmissible in this trial.  So

2    in most respects, it is granted, and let me try to explain.

3           Under Rule 403, I believe that the risk of

4    confusion of the jury, the risk of unfair prejudice to the

5    patentee and the I think enormous amount of time that would

6    be required in order for both sides to be able to fairly

7    present their positions, both substantively and procedurally

8    with respect to what has happened in the IPR, what has not

9    happened in the IPR with respect to claim 12, what remains

10   to be done, the different burden of proofs, the different

11   claim construction standards, the implications of the

12   finding with respect to claim 11 for claim 12 and all of

13   that I think would take a great amount of time.  I'd have to

14   allow it all to be put in front of this jury.  I'm already

15   allowing enough to be put in front of this jury.

16          All of that I believe substantially outweighs

17   whatever probative value there is to the final written

18   decision and the status of the IPR that the defendants seek

19   to put in front of this jury.

20          I recognize there is some probative value to

21   that, but it is not nearly what defendants suggest.  If I

22   understand that correctly, defendants are arguing that all

23   of the claims that are in the IPR are currently invalid.  I

24   don't understand that to be the law.

25          As I understand the law, the patent is valid

1    unless and until the PTAB's decision is upheld by the

2    Federal Circuit or the plaintiff decides not to take an

3    appeal.  My understanding is there is an appeal pending or

4    at least at the time before such an appeal has not yet run.

5         In addition, of course, with respect to claim

6    12, the PTAB found for whatever reason that there is not

7    even a reasonable likelihood that the defendant, under a

8    lower standard of proof, could prove that that claim is

9    invalid.  So there is some probative value, but there is a

10   great, great deal of countervailing risk of prejudice and

11   confusion and the other concerns of Rule 403 and, therefore,

12   I'm not allowing that in.

13        Again, just to try to be clear, that does not

14   mean that evidence is inadmissible just by virtue of the

15   fact that it was also part of the IPR.  If you take proper

16   care to redact, to instruct your witnesses not to mention

17   the IPR or the PTAB, then certainly you can use evidence

18   that might otherwise be proper even though it was part of

19   the IPR.  And I understand that to be consistent with what

20   the parties have agreed on.

21        Next is AVX's Motion in Limine No. 2, to

22   preclude Greatbatch from being awarded damages on tests for

23   scrapped parts.

24        This one is granted in part.  It is granted with

25   respect to lost profit damages.  Greatbatch is not permitted

1    to seek lost profit damages for parts never sold.  In all

2    other respects, the motion is denied.

3              The statute gives the plaintiff a right to

4    seek and obtain at least a reasonable royalty damage for the

5    infringement, including infringement by making tests for

6    scrapped parts.

7              AVX can object, of course, to expert testimony

8    that it believes is beyond the scope of what was disclosed

9    prior to trial.

10              And, relatedly here, Greatbatch asks for an

11    opportunity to supplement its expert report to indicate that

12    reasonable royalties apply to scrapped units.  This request

13    is denied as untimely.

14              Finally for the motions in limine, AVX's Motion

15    in Limine No. 3, to preclude Greatbatch from misrepresenting

16    the limitations or scope of the '627 patent and some related

17    prior art, this motion is denied.

18              Arguably again here, this motion is really

19    multiple motions and could be denied on that ground alone.

20    I'm not denying it on that basis.  I am denying it on the

21    ground that the issue of the scope of the prior art, whether

22    prior art is analogous or not, all of that implicates fact

23    questions relevant to obviousness and is properly before the

24    jury.

25              So, for instance, testimony that AVX seeks to

1    exclude regarding whether the '627 patent is or is not

2    limited to medical devices, that is relevant evidence and

3    should be admitted as it is probative of issues such as

4    whether certain prior art would be considered by a person of

5    ordinary skill in the art and relevant to the motivation to

6    combine.

7            Of course, no party will be permitted to

8    intentionally mischaracterize any evidence, including the

9    scope of the patents, but all of the issues that AVX

10   presents in its motion and suggests are mischaracterization

11   of the evidence I view instead as fair game and different,

12   reasonably different points of view as to the fair

13   inferences from the evidence.

14           Now, it's with respect to this motion that I

15   believe the request to clarify the claim construction by

16   plaintiff comes up and we heard argument separately on that.

17   This goes back to the '627 patent and the "conductively

18   coupled" term.  Plaintiff's request that we construe the

19   term or modify our construction is denied.

20           At bottom, the plaintiff's position is based

21   on an alleged disclaimer in the patent.  I'm not persuaded

22   there is a disclaimer.  The burden is high and was accurately

23   characterized by the defendants in the argument and especially

24   in light of the claim differentiation arguments here, I am not

25   persuaded that there is a disclaimer.  Therefore, the

1    plaintiff's request is denied.

2              I want to spend most of our limited time talking

3    about the remaining issues in dispute, but I have now said a

4    lot.  Are there any questions about what I ruled from the

5    plaintiff?

6              MR. SLIFKIN:  No, Your Honor.

7              MR. MULDOON:  (Shaking head no.)

8              THE COURT:  Okay.  From defendants?

9              MR. WHETZEL:  No, Your Honor.

10             THE COURT:  No?  Okay.  Let's talk about some

11   of these miscellaneous or additional issues.

12             First, on my list is whether the issue of

13   alleged improper inventorship should be presented to the

14   jury or deferred to a bench trial.  Let me hear from the

15   plaintiff on that, if it continues to be your view that

16   all of that should be deferred.

17             MS. SMALLEY:  Yes, Your Honor.

18             Basically, our position is set out in our

19   Exhibit 16 but clearly inequitable conduct, and I think the

20   defendant has conceded, is an issue for the Court.  Under

21   the *Shum* case, the 256 correction of inventorship is for the

22   Court.  And the defendants' answer makes clear that they

23   are alleging the patent is either invalid or enforceable due

24   to inequitable conduct, not simply invalid due to a mistake,

25   innocent mistake in inventorship.  So we believe that the

1   inequitable conduct, including inventorship, should be tried

2   to the Court.

3            THE COURT:  Let me stop you.  If we don't let

4   them say inequitable conduct and we just focus them on the

5   alleged basis for invalidity of improper inventorship, why

6   shouldn't we let this jury resolve the facts that underpin

7   that defense?

8            MS. SMALLEY:  Well, first, I don't think it was

9   ever actually innocent or innocent mistake and inventorship

10  was never pled, so it was always intentional.  I think however

11  you phrase it, that is in essence inequitable conduct.

12           If the Court were to find that it has been pled

13  properly and can be presented to the jury, then the issue

14  is simply whether Bob Stevenson contributed to the invention

15  and they shouldn't be able to argue his motive for intent,

16  because that throws it right back into inequitable conduct.

17           THE COURT:  Do you anticipate bringing

18  Mr. Stevenson to trial to testify?

19           MS. SMALLEY:  Yes.

20           THE COURT:  So as part of a fair

21  cross-examination, wouldn't I have to let them get into

22  whatever intent or motivation Mr. Stevenson may have on

23  any issues in this case?

24           MS. SMALLEY:  Normally I would say yes, but I

25  think if you are talking about him intentionally

1    misrepresenting his inventorship status to the Patent Office

2    and filing a false declaration, that's just redressing the

3    inequitable conduct claim.

4                    THE COURT:  All right.  Thank you.  Let me hear

5    from the defendant.

6                    MR. RAWNSLEY:  Your Honor, misjoinder of

7    inventorship under Section 102(f), inequitable conduct, are

8    distinct legal defenses.  AVX pled both.  It pled both in its

9    answer.  It says invalidity and it says inequitable conduct.

10                   They have different requirements.  To prove

11   inequitable conduct, we have to show that material

12   information was intentionally withheld from the Patent and

13   Trademark Office.  To show misjoinder of inventorship, we

14   have to show there was not a contribution to at least one

15   claim that is corroborated that was significant and that

16   there was collaboration with the other inventor.

17                   AVX has continually taken a position throughout

18   this lawsuit that it is proceeding on both, and it always

19   has.  I can point the Court to many instances, but just

20   right here is our summary judgment motion.  AVX Filters

21   respectfully moves this Court for summary judgment of

22   invalidity under 35 Section 102(f).

23                   THE COURT:  All right.  So if I let you do this,

24   how can I be sure you are not going to try to suggest or

25   argue to the jury that there is some inequitable conduct here?

1            MR. RAWNSLEY:  Well, the inequitable conduct

2     turns on the submission of the false affidavit.  That simply

3     is not anything we need to prove to invalidate the patent

4     under Section 102(f).

5            Now, the evidence that he is not an inventor is

6     what it is, and we should be able to put that on.  But we

7     are under no obligation to disprove that he is an inventor

8     with reference to his submission of a false affidavit to the

9     Patent and Trademark Office.

10            THE COURT:  Do you need to get into his intent?

11            MR. RAWNSLEY:  I cannot stand here and say

12     that some people couldn't see that as intent as some of the

13     evidence overlaps to show he is not an inventor because I

14     can think of at least one document, there are facts within

15     there that someone could read as giving him intention, but

16     the document itself also says he was not making any

17     contribution to this.  So to the extent it is the same

18     evidence, that is simply the evidence that we need to prove

19     our underlying inventorship claim.

20            THE COURT:  I recall part of your case I think

21     that he had a financial interest or motivation to be named

22     as an inventor on I think as many patents as possible but at

23     least this one.  Is that part of what you would try to prove

24     in front of a jury?

25            MR. RAWNSLEY:  Well, Your Honor, the same

1    document in which that financial interest is stated also

2    attributes some of the elements that they're now saying

3    that Stevenson invented, it attributes that to Brendel.  So

4    that is a document we need to rely on for our inventorship

5    defense and counterclaim.

6              THE COURT:  Okay.  Thank you.  I'm going to let

7    the defendant proceed on this defense in front of the jury.

8    By this defense, I mean the improper joinder or misjoinder

9    defense.

10             Obviously, inequitable conduct per se is not

11   part of the jury trial.  That will be tried separately in

12   front of the bench.

13             So the implications of that are if evidence is

14   solely relevant to the inequitable conduct, then it's not

15   to be presented in front of the jury.

16             The further implication is, of course, the

17   phrase "inequitable conduct" should not be uttered in front

18   of this jury, but the defendant has a separate misjoinder

19   defense.  There are factual underpinnings to it.  The

20   evidence is what it is.  And it will be helpful, if not

21   necessary, for the jury to weigh in on those factual issues

22   that underlie it.  So that is the ruling there.

23             There is next on my list, Greatbatch has some

24   concerns regarding certain Medtronic products and how the

25   defendants may want to use them as part of their invalidity

1     defenses.  Let me hear briefly from the plaintiff.

2              I guess start by assuring me you understand this

3     to be opposed; correct?

4              MS. SMALLEY:  Yes, I do.

5              THE COURT:  Okay.

6              MS. SMALLEY:  Basically, the Medtronic 122/123

7     reference was not selected by the defendant in its August

8     17th selection of references for claim 12.  So we believe

9     that the invalidity defense on that is not properly before

10    the jury.  And the derivation defense was not addressed in

11    invalidity contentions or expert report.  So we believe that

12    that is not an issue for the jury either.

13             THE COURT:  Okay.  Let me hear from defendant.

14             MR. RAWNSLEY:  Your Honor, defendants do intend

15    to proceed on the Medtronic 122/123 references as prior art.

16    It in fact was selected as one of the references in our

17    disclosure of prior art references and obviousness

18    combinations in NDT 122/123.  It's right there.

19             THE COURT:  Say it again.

20             MR. WHETZEL:  It's Medtronic NDT 122/123.

21             THE COURT:  I'm sorry.  Where in the record is

22    that?

23             MR. RAWNSLEY:  Well, this is in, the document

24    that we served on them pursuant to the Court's Order that we

25    identify our prior art references.  I'd be happy to hand

1    this up to the Court.

2            THE COURT:  Well, at least tell us the date so

3    plaintiff can.

4            MR. RAWNSLEY:  Yes, this is pursuant to the

5    Court's Order.  It is dated August 17th, 2015.

6            THE COURT:  All right.  I don't need to see it yet.

7            MR. RAWNSLEY:  Okay.  Medtronic references, this

8    particular Medtronic reference which is at issue here, we

9    believe it is relevant to several issues in the lawsuit.

10   First of all, the reference is, it is a letter sent from

11   Medtronic directly to one of the inventors of the '627 patent.

12           THE COURT:  Let me stop you there.  I understood

13   the argument just to be that you didn't timely select it

14   with respect to the claims you want to use it for now.

15           What is the argument?  I'm looking at plaintiff

16   now.  The August 17th, 2015 submission, does that not do it?

17           MS. SMALLEY:  No.  I mean it is selected as one

18   of the references, but it is not put against claim 12 or

19   even independent claim 11.  So we say that for proceeding on

20   claim 12, they have not selected that reference.

21           THE COURT:  Okay.  Is that correct?

22           MR. RAWNSLEY:  Your Honor, the Court's Order

23   required us to identify from the list of references that we

24   had previously been asserting to identify those references

25   that we were going to assert and as well to identify the

1    combinations that we intended to assert because that was

2    what the plaintiff was upset with at that point was that

3    they were arguing that we had not merely disclosed our

4    combinations.

5            It is correct it is not disclosed as a

6    combination, but that shouldn't prevent us from proceeding

7    for other purposes, anticipation or in itself for obviousness.

8            THE COURT:  So what is it you propose to do, use

9    each of these for anticipation?

10           MR. RAWNSLEY:  Anticipation or obviousness, as

11   necessary.

12           THE COURT:  But not as a combination.

13           MR. RAWNSLEY:  No, we do not plan and we haven't

14   told them that we intend to use it in combination.  That is

15   not a position we have taken.

16           THE COURT:  Did you disclose it as an anticipatory

17   reference or is it your view you didn't have to do it?

18           MR. RAWNSLEY:  It was disclosed as an

19   anticipatory reference in Professor Webster's report.  That

20   was a chart directed to it.

21           THE COURT:  For this particular claim?

22           MR. RAWNSLEY:  For claim 11, which forms part of

23   claim 12.  That's correct.

24           THE COURT:  Okay.

25           MS. SMALLEY:  No.

1             THE COURT:  Hold on.

2             But for claim 11 or claim 12?

3             MR. RAWNSLEY:  For claim 11, Your Honor.

4             THE COURT:  But we're going to trial on claim

5     12; right?

6             MR. RAWNSLEY:  We believe that, but we believe

7     that in itself this renders obvious claim 12 because of the

8     distinction of what claim 12 adds to claim 11.

9             THE COURT:  That may be true, but did you ever

10    disclose it as a reference with respect to claim 12?

11            MR. RAWNSLEY:  We did not, Your Honor.

12            THE COURT:  So on what basis should I excuse that?

13            MR. RAWNSLEY:  We simply think that as what is

14    disclosed in the expert report provides a sufficient basis

15    to show that it invalidates claim 12.

16            THE COURT:  All right.  What about the

17    derivation point?  Is that a different point?

18            MR. RAWNSLEY:  That is a different point, Your

19    Honor.  This is, Professor Stevenson has argued that he is

20    an inventor as to certain claims of the '627 patent.  One of

21    those claims is claim 13.  We must disprove that because he

22    is arguing he contributed it and that it is significant.

23            Professor Webster disclosed in his expert

24    report -- in his opening expert report, he said this cannot

25    be significant because there is this Medtronic 122/123

1    reference which was simply part of the state of the art.

2    This is a reference that was sent from Medtronic to one

3    of the named inventors on the '627 patent.  So both of them

4    were aware of this when they received it.  This was

5    addressed in his opening report.  This was addressed in his

6    reply report.  The author of the document was deposed.

7    Brendel was deposed on it.  There has been full and fair

8    disclosure of that position.

9              THE COURT:  All right.  Thank you.

10             Let me hear again from plaintiff, if you have

11   anything you want to add.

12             MS. SMALLEY:  Your Honor, I didn't understand from

13   the pretrial order that they're using this on inventorship.

14   The pretrial order just states that the claim is invalid due

15   to derivation for Medtronic 122 and 123.  That is not -- I

16   mean that is a separate issue from inventorship.

17             THE COURT:  Do we have any of the defendants'

18   response on this issue in the pretrial order?

19             MS. SMALLEY:  I think they just said defendants

20   disagree.

21             THE COURT:  All right.  Well, I'm going to

22   need further assistance on this set of issues that we just

23   discussed.  So before we break, we'll talk about what that

24   assistance should look like.

25             Next, AVX has a concern with witnesses being

1   recognized as -- expert witnesses being recognized as

2   experts.  Who wants to address that?

3           MR. WHETZEL:  Yes, Your Honor.  Consistent with

4   the practice of at least some judges or former judges in

5   this court, it's been viewed as inappropriate to ask the

6   Court to recognize or essentially anoint a particular

7   witness as an expert for fear that that gives undue weight

8   to a witness's testimony.  It would apply to both sides.  I

9   think that may be particularly heightened here given the

10  earlier *Daubert* motion we filed that the Court has denied

11  permitting Professor Stevenson to testify in the form of an

12  expert.

13          THE COURT:  So what would we do to, as a

14  gateway, allow someone to testify as an expert?

15          MR. WHETZEL:  Your Honor, what other members of

16  the bench and this court have done is simply allowed counsel

17  to lay a foundation, to establish the expertise of the

18  witness as one normally would, and to then proceed into

19  questions in the form of expert opinions.  If there is an

20  objection at that point in time, the Court rules on the

21  objection.  Otherwise, we dispense with the procedure where

22  one lawyer or the other largely for show in front of the

23  jury says I ask the Court to recognize Mr. X as an expert.

24          THE COURT:  All right.

25          MR. WHETZEL:  That is our position.

1              THE COURT:  Is this opposed?

2              MR. MULDOON:  Yes, Your Honor.  With respect

3    to Mr. Stevenson, this is an issue between Mr. Stevenson

4    who was disclosed and submitted reports as an expert, giving

5    expert testimony, versus Dr. Panlener who the Court has

6    already ruled is a fact witness but has specific technical

7    knowledge.

8              Professor Stevenson is one of the world's

9    renowned experts and has over 120 patents in this field.  We

10   believe that the evidence that goes into that foundation for

11   his opinions is worthy for the jury to hear that he meets

12   the standards for giving expert opinions before them.

13             THE COURT:  All right.  I think both sides are

14   clearly reasonable here.  But my standard practice at least

15   in recent years has been to have you, at the end of the

16   essentially voir dire of the expert, say "we hereby offer

17   expert so-and-so as an expert," and I ask if there is an

18   objection.  And if there isn't, then I say "he or she is so

19   recognized."  That is as much as I say.

20             I'm going to adhere to that general practice.

21   Of course, I will apply it equally to both sides' experts.

22   And I am be sure you will all not let me do otherwise.  I

23   will be sure to instruct the jury carefully on what it means

24   to be an expert and how they are the final judges of the

25   credibility of all witnesses, including experts.

1          Next, AVX wants to somehow divide examinations

2     of witnesses between multiple attorneys, or maybe it is

3     Greatbatch.  I forget.

4          MR. MULDOON:  No objection either way.  We kind

5     of both split the case up differently amongst our team, so

6     there will be a few witnesses that for each side there will

7     be multiple attorneys examining the witness.

8          THE COURT:  Do you have in mind multiple

9     attorneys at the same time questioning the witness or just

10    at different points in the case?

11         MR. MULDOON:  With respect to, for example,

12    Your Honor, Mr. Stevenson, who is an inventor of multiple

13    patents, I understand that the defendants have split that up

14    on a per patent basis.

15         Our team has split things up more on

16    infringement and invalidity issues.  So, for example, if

17    there is, if Professor Webster is on the stand opining both

18    as the noninfringement and invalidity, one attorney would

19    handle the infringement questioning and then hand it over

20    for the invalidity type, just as the different attorneys

21    would examine Mr. Stevenson on different patents.

22         THE COURT:  And you have no objection to that?

23         MR. MULDOON:  No, Your Honor.

24         THE COURT:  And is that all consistent with

25    defendants' understanding as well?

1          MR. WHETZEL:  It is, Your Honor.

2          THE COURT:  All right.  Well, I have seen that

3    done badly before in a way that confuses the jury and

4    arguably is abusive to the witness.  I don't want that to

5    happen.  Do your best to make it clean and sort of I guess

6    segregable would be the word.

7          It would be a shame if a series of three or

8    four lawyers all kept popping up and trying to impeach the

9    witness repeatedly on perhaps the same points just because

10   he or she talked about three or four patents, but I will

11   trust that you will all handle that responsibly.

12         In terms of closing the courtroom, evidently

13   there is no dispute that that is going to be requested at

14   least some times.  My procedure there is you really need to

15   give me some notice so I can make sure, among other things,

16   I have Court Security Officer around in case somebody needs

17   to be asked to leave and if we need to lock the doors.

18         Provide notice to one another and provide notice

19   to me.  And keep the requested portion of the trial, the

20   portion that you request be closed to the public, keep it

21   to the bare minimum necessary.  Try your best to segregate

22   whatever portion of the examination is going to be kept

23   confidential from the public so we don't have to repeatedly

24   open and close the courtroom.

25         As long as you comply with that, we shouldn't

1    have a problem.

2              Juror notebooks.  I only wanted to point out the

3    burden is on all of you to prepare those.  It looked as if

4    you are in agreement as to giving juror notebooks and what

5    will be in them.

6              I guess my only other question there was once

7    or twice, I've had photos of the witnesses put in the juror

8    notebooks.  Is that a something you all considered or would

9    be amenable to?

10             MR. MULDOON:  I have not considered it, Your

11   Honor, and we can discuss with others.

12             THE COURT:  Okay.

13             MR. WHETZEL:  I was going to say we haven't

14   discussed it, but we will discuss that, Your Honor.

15             THE COURT:  I order you to discuss it.  If

16   you reach an agreement, then proceed according to your

17   agreement.

18             We still have a dispute regarding the '077

19   patent and how it should be discussed.  I am really to

20   address that now.

21             Having reviewed the letter, I agree with AVX on

22   this point.  Therefore -- and I don't think I have an order

23   to sign, so if that is correct, and I direct AVX to submit

24   an order to which Greatbatch will agree as to form which

25   will accomplish what AVX proposed in the letter regarding

 1    the '077 patent which is essentially the infringement claims

 2    are dismissed, the affirmative defenses and counterclaims

 3    are dismissed, but AVX may maintain its ability to claim it

 4    as a prevailing party at least for purposes of Section 285

 5    and the right to seek attorney fees and costs under any

 6    applicable statute or law.

 7              And whether or not something further needs to be

 8    proven in order for AVX to be deemed a prevailing party is

 9    an issue we'll address later, if we have to.

10              Are there any questions about any of that,

11    plaintiff?

12              MR. MULDOON:  No, Your Honor.

13              THE COURT:  Defendants?

14              MR. WHETZEL:  No, Your Honor.

15              THE COURT:  In our remaining time, let's first

16    talk about this trial and how long it is going to be.  You

17    all had asked for 30 hours a side.  I don't believe I have

18    ever had a trial more than 24 hours a side, and my strong

19    sense is this case can be tried fairly by both sides in no

20    more than 24 hours per side, particularly in light of some

21    of the rulings I have made.

22              Secondary considerations is not in the case.

23    Evidence regarding the IPR is not in the case.  We don't

24    yet know whether the '627 patent particularly infringement

25    will be in the case.  You all are going to meet and confer

 1    about all of that.  If anybody appeals feels particularly

 2    prejudiced by a limit of 24 hours, I will hear that now.

 3              Plaintiff?

 4              MR. MULDOON:  That's fine, Your Honor.

 5              THE COURT:  Okay.  Defendants?

 6              MR. WHETZEL:  We'll abide by that, Your Honor.

 7              THE COURT:  All right.  Well, then I do hereby

 8    allocate a maximum of 24 hours per side.

 9              I will get an order out that tells you I do

10    have certain conflicts.  Some of the days are going to be a

11    little shorter than our normal.  The normal is that counsel

12    is here from 8:30.  The jury is here from 9:00 to 4:30.  I

13    know on the 12th and the 13th, the first Tuesday and

14    Wednesday, I need to end at either 3:00 or 4:00 o'clock.

15    I'll clarify that and put that in an order for you.

16              There is no trial on Monday the 18th.  That is a

17    federal holiday.  And Thursday the 21st, I have to end by

18    3:30.

19              So, again, I'll put that all together for you in

20    an order.

21              We aim for approximately an hour of breaks a

22    day, a 15 minute break in the morning, 15 minute break in

23    the afternoon, roughly a half hour for lunch because we

24    provide lunch to the jury after the first day.

25              In terms of counting time, I think you all have an

1    understanding of that.  Basically, other than jury selection

2    and me reading instructions to the jury and whatever argument

3    we have on the jury instructions during the trial, other than

4    that, if I'm in the courtroom, somebody is being charged for

5    the time.

6                   Are there any questions about time?

7                   MR. MULDOON:  No, Your Honor.

8                   THE COURT:  No.

9                   MR. CAHILL:  (Shaking head no.)

10                  THE COURT:  From defendants?

11                  MR. WHETZEL:  No, Your Honor.

12                  THE COURT:  Turning to the remainder of the

13   pretrial order.  If the parties did not identify a dispute

14   in the pretrial order and I don't address it, then what you

15   have proposed is acceptable and hereby adopted.

16                  I don't see anything further we need to talk

17   about now in terms of what the bench trial issues will be

18   or any issues as to what the legal issues and fact issues

19   to be tried are going to be.

20                  Are there any questions on any of that?

21                  MR. WHETZEL:  No, Your Honor.

22                  MR. MULDOON:  There are some issues, Your Honor,

23   with respect to further modifying each party's proposed

24   final jury instructions in light of many of the rulings that

25   have been made today.

1                    THE COURT:  Right.  I appreciate that.  Thank you.

2              So I do want a new version of the final jury

3    instructions as well as the final verdict sheet in light of

4    what I have ruled today.  And it needs to await whatever you

5    all decide with respect to the '627 as well.

6              I don't need the next version of the final jury

7    instructions and verdict sheet until we start the trial.  So

8    in the absence of some agreement between the parties to the

9    contrary, let's say those are due by Tuesday, the first

10   Tuesday of trial, at the end of the day.

11             Now, to the extent you want to modify the

12   preliminary instructions as well, that, I do need in advance

13   of trial because I need to docket that for you before we

14   start jury selection.  So let's make that due by the

15   Thursday before trial begins.

16             Are there any questions about any of that?

17             MR. MULDOON:  (Shaking head no.)

18             THE COURT:  Are there questions about that?

19             MR. CAHILL:  (Shaking head no.)

20             THE COURT:  No.  Is there something else you

21   want to raise?

22             MR. MULDOON:  Yes, Your Honor.  It appears we

23   have, in light of some updated sales data, we need to amend

24   our exhibit list, and there are two corrections as well.

25             MS. SMALLEY:  Right.

1          THE COURT:  Is that something you have discussed

2    with the defendants?

3          MS. SMALLEY:  Yes, I brought it up.

4          MR. RAWNSLEY:  It was raised briefly with us

5    right before we walked in, but we'll discuss it with them.

6          THE COURT:  I trust there won't be an issue with

7    that.

8          In terms of, now coming to witnesses, there were

9    some disputes about witnesses, whether Mr. Stevenson should

10   be sequestered and objections regarding an Aaron Cook and

11   Neal Springarm and something about Professor Pilgrim's claim

12   construction declaration.

13         Do plaintiffs want to be heard on any of these

14   issues?

15         MR. MULDOON:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. MULDOON:  The two individuals on the exhibit

18   list are the laboratory individuals who prepared testing

19   that were relied upon by Dr. Pilgrim with respect to his

20   reports.

21         While AVX does not object to the authenticity

22   of Mr. Springarm's photographs, I understand that they still

23   object to the admissibility of them and, therefore, if there

24   is going to be a dispute over these photographs, the

25   individual who, if you recall, we had to pick somebody in

1    Los Angeles where Mr. Rawnsley brought the samples to

2    Mr. Springarm's office, which wasn't done until the very end

3    of discovery, additionally, the other witness was from IMR

4    Test Labs, in Ithaca, New York who prepared the photographs

5    and images of three samples that we did receive.

6           THE COURT:  Okay.  And why should Mr. Stevenson

7    be treated any differently for sequestering purposes?

8           MR. MULDOON:  Well, Your Honor, what I would

9    propose with respect to Mr. Stevenson is since his expert

10   opinion deals with invalidity issues is that he be sequestered

11   during the infringement case, but once AVX moves into its

12   invalidity case that he be allowed to hear the testimony of

13   AVX's invalidity witnesses so that he can consider those in

14   rendering his opinions.

15          THE COURT:  Okay.  Thank you.  Let me hear from

16   defendants.

17          MR. WHETZEL:  Your Honor, as to Professor

18   Stevenson, the delineation that Mr. Muldoon proposed doesn't

19   quite get to the problem.  Professor Stevenson's expert

20   opinions, subject to voir dire later to see if they're in

21   fact expert opinions, relate to very limited and discrete

22   subjects.  What they don't relate to is the basic facts and

23   circumstances of the invention story or invention history

24   here.

25          We think that he is a pure fact witness on

```
 1    those issues as to his collaboration and the corroboration,

 2    who did what during the course of the invention, and at a

 3    minimum he should be excluded during the fact testimony of

 4    other witnesses who are speaking to those issues, primarily

 5    his primary coinventor.

 6              THE COURT:  All right.  These other two

 7    witnesses?

 8              MR. WHETZEL:  The witnesses that immediately

 9    come to mind, Your Honor, would be his purported coinventor.

10              THE COURT:  No, I meant to manufacture on to the

11    other issue.

12              MR. WHETZEL:  Oh, I'm sorry.  Yes.  That would

13    be Mr. Cahill.

14              THE COURT:  Okay.

15              MR. CAHILL:  Yes, Your Honor.  We object to

16    these two witnesses providing any substantive testimony

17    because they have never been disclosed and we have never

18    been able to take their deposition.

19              THE COURT:  Do you object to them coming in to

20    authenticate these photographs?

21              MR. CAHILL:  We agreed to waive authentication

22    objections.  We wouldn't agree to waive other evidentiary

23    objections.

24              THE COURT:  All right.  Where does that leave

25    us?  Do you need them for something more than authentication?
```

1          MR. MULDOON:  Well, Your Honor, with respect,

2   authentication would involve the equipment and whether or

3   not there were any difficulties in focusing the camera on

4   the images that the defendants' counsel says are worthless

5   and not suitable for expert, subject of expert testimony.

6   So we would need him to, authentication is somewhat broader

7   than, yes, I took the pictures.

8          THE COURT:  Okay.  Thank you.  So I can give you

9   a partial ruling on these, and I'll need to know whether

10  this resolves the issue or not after you have had a chance

11  to confer further.

12          With respect to Mr. Stevenson, I agree

13  conceptually he should be sequestered on those issues for

14  which he is going to be a fact witness and not sequestered

15  on those issues for which he is an expert witness.

16  Hopefully, I didn't get that backwards.  But how we're going

17  to actually do that, I need you all to meet and confer on,

18  and if there are specific portions of the trial that you are

19  not in agreement on, you will have to bring those disputes

20  to my attention and I'll resolve them.

21          With respect to these two lab technician

22  witnesses, I will permit them to testify at least with

23  respect to authentication, and I may permit them to testify

24  beyond that as well.  But if you all can't resolve that,

25  then I'm going to need to have something in writing to show

1    me exactly what was disclosed when and what the topics are

2    beyond pure authentication that the plaintiff wants them to

3    testify on.

4              We only have a few minutes left.  Why don't

5    I turn to you all now and see if there are things you are

6    particularly concerned with that you want to make sure

7    we address before we part for today, first from the

8    plaintiff.

9              MR. MULDOON:  There are still some disputes

10   about the jury verdict sheet and their jury questionnaire.

11             THE COURT:  Thank you.  So the jury

12   questionnaire, as I understand it, you oppose using a

13   questionnaire; is that correct?

14             MR. MULDOON:  Your Honor, the last probably

15   six to eight questions are completely objectionable and

16   trying to taint the jury.  The first half of the form is

17   duplicative of the form information already used and the

18   middle few questions are duplicative of the Court's voir

19   dire.

20             THE COURT:  All right.  I'm not going to do the

21   jury questionnaire.  I have done it in a couple of cases but

22   every time I have done it, it has been without objection.

23   To the extent there are, my understanding is that plaintiff

24   objects to using it at all.  It also came in fairly late.

25   I'm told it would have to get into the mail today in light

1    of the holidays.  I think that my voir dire process and

2    the follow-up I allow from counsel will adequately protect

3    everybody's rights with respect to jury selection.

4              In terms of jury instructions and verdict sheet,

5    as I have already indicated I think, you will be getting me

6    a new version by the Tuesday of trial and I'll let you know

7    some time during trial when we'll have argument on any

8    remaining disputes.

9              Yes.

10             MR. MULDOON:  Your Honor, it's our belief that

11   there will be numerous exhibits that will be presented that

12   are technically -- there are engineering drawings, technical

13   documents that disclose proprietary information regarding

14   products.  We would ask that those be filed under seal with

15   respect to those exhibits that have that level of information.

16             THE COURT:  Is there any objection to that concept?

17             MR. WHETZEL:  Your Honor, a lot of this

18   technology is very old, and I'm not sure that it meets

19   the Third Circuit standard for sealing evidence that is

20   presented at trial.

21             THE COURT:  All right.  Well, we'll deal with

22   those objections.  If there is an objection to a particular

23   exhibit that the plaintiff or defendants for that matter

24   wants to be sealed, that is something that you will talk

25   about in the process of disclosing exhibits to one another

1    and make the objection known to me in the morning when the

2    witness is going to testify, and we'll resolve it in that

3    context.

4                   Are there other issues from the plaintiff?

5                   MR. MULDOON:  Nothing further, Your Honor.

6                   THE COURT:  All right.  How about from the

7    defendants?

8                   MR. WHETZEL:  Yes, Your Honor.  The only

9    other issue, and it is admittedly a fairly minor one, is

10   the parties were not in agreement on the timing of the

11   disclosure and submission of deposition designations.  I

12   apologize to take the Court's time but it's not clear what

13   the rules are going to be.

14                  THE COURT:  I saw that.  Actually, that was the

15   next thing I wanted to make sure to touch on so you know

16   what to do.

17                  I'm going to go with Greatbatch's proposal there

18   which is a little bit more time, requires you all to start

19   earlier but I think will help me do my best to get you

20   rulings on time so that you can be prepared to play or read

21   whatever you are permitted to play or read.

22                  Is there anything else from defendants?

23                  MR. WHETZEL:  Your Honor, the only general

24   question is that these time frames for advanced disclosures,

25   hopefully we can work this out among counsel, oftentimes

1    don't work as well when we get to rebuttal cases, and

2    presumably there will be some spirit of compromise and

3    understanding that in rebuttal cases, we can't necessarily

4    predict a rebuttal case three or four days in advance of

5    the completion of the prior case.

6              THE COURT:  Right.  In my experience, there has

7    been reasonable accommodation on those issues.  And I trust --

8              MR. MULDOON:  We will do our best to be

9    reasonable, Your Honor.

10             THE COURT:  All right.  If someone is not

11   reasonable, I expect I will hear about it.

12             In terms of the further assistance that I need

13   from you, by my recollection here, I said I need some, I

14   need to hear back from you what your thoughts are on the

15   '627 infringement issue.

16             I also set aside the question about the

17   Medtronic prior art and how, if at all, that is going to be

18   used, and then the recent questions that just came up about

19   Mr. Stevenson and the lab technician witnesses.

20             Let's proceed this way.  I'd like, as I have

21   indicated before, a joint letter tomorrow.  In that letter,

22   tell me whether you have worked out any of those disputes,

23   and if you haven't, tell me the timing with which you

24   propose to get me whatever short written submissions that

25   you want me to have in order to resolve those disputes.

1        Are there any questions about that?

2              MR. MULDOON:  No, Your Honor.

3              MR. WHETZEL:  No, Your Honor.

4              THE COURT:  I guess that covers it all.  Thank

5     you all very much.  Happy holidays and safe travels.  We

6     will be in recess.

7              (Pretrial conference ends at 2:02 p.m.)

8

9         I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.

10

11                           /s/ Brian P. Gaffigan
                           Official Court Reporter
12                           U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25